NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of

the opinion to request a rehearing. Also, opinions are subject to

modification, correction or withdrawal at anytime prior to issuance of the

mandate by the Clerk of the Court. Therefore, because the following slip

opinion is being made available prior to the Court's final action in this

matter, it cannot be considered the final decision of the Court. The official

copy of the following opinion will be published by the Supreme Court's

Reporter of Decisions in the Official Reports advance sheets following final

action by the Court.

                                       

                                       

                   Docket No. 77259--Agenda 1--March 1996.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ERIK WARD BIRDSALL,

                                  Appellant.

                         Opinion filed June 20, 1996.

                                       

                                       

     JUSTICE McMORROW delivered the opinion of the court:

     Defendant, Erik Birdsall, was convicted of first degree murder,

attempted murder, aggravated battery with a firearm, and armed robbery. The

trial court sentenced defendant to death. On appeal, defendant contends that

he received ineffective assistance of counsel and that various trial errors

denied him due process of law. Specifically, defendant claims that his

counsel mistakenly believed that defendant would be entitled to acquittal if

he were found not to be the actual shooter, and because of this erroneous

view, conceded defendant's guilt to participation as an accomplice in the

crimes charged. Defendant also argues that his counsel was ineffective for

failing to request a fitness hearing notwithstanding counsel's awareness that

defendant was taking psychotropic medication and had a history of mental

problems. Defendant further cites three instances of alleged error in

connection with the sentencing proceedings and challenges the Illinois death

penalty statute as unconstitutional.

     We hold that defendant was entitled to a fitness hearing pursuant to

statute and precedent of this court; accordingly, we reverse and remand the

cause for further proceedings.

                                   BACKGROUND

     In June 1993 one man was murdered and another wounded following a party

held in the victims' apartment in Davenport, Iowa. The deceased, Charles

Kunkle, and his roommate, Earl Houck, had hosted a beer party in their

apartment earlier in the evening of June 5, 1993. William Horton, Raymond

Smith, and defendant, all of whom had attended the party, returned to the

victims' apartment in the early morning hours of June 6 and told Kunkle they

had found him a girlfriend and would take him to meet her. Kunkle and Houck

accompanied defendant and Horton to Smith's car, and all five men then drove

to the "Big Island" area of Rock Island County, near the Mississippi River.

According to testimony of the survivor, Houck, defendant said "the girls

might be out fishing at this place."

     Smith stayed in the car. Horton and defendant walked toward the

shoreline of the river with Houck and Kunkle. When the victims saw that there

were no girls, Houck started back toward the car. He stopped when he saw

defendant holding a gun. Defendant told Houck and Kunkle to get down on the

ground. Defendant then fired a shot into the air, after which Houck and

Kunkle lay down, about five feet apart.

     According to Houck's trial testimony, Horton held him down while

defendant approached Kunkle and shot him in the back of the neck. Houck

testified he saw defendant pulling his hand away from Kunkles' rear pants

pocket. Next, Houck was shot in the back of the neck by someone who stood

over him. Houck did not see who shot him, and agreed it could have been

Horton, although Houck believed that it was defendant. Either Horton or

defendant searched Houck's pockets but did not take his food stamps.

     Autopsy evidence revealed that Kunkle was killed by a contact wound to

the neck, probably made by a .22-caliber handgun. Other medical evidence

indicated that Houck had been shot in the back of the neck and slightly to

one side of the midline. Neither of the two bullets fired into the victims

were recovered. A gun that was recovered from codefendant Horton's car was a

.22-caliber "J.C. Higgins Ranger" model. Police did not test fire the weapon.

     Defendant's former girlfriend, Michelle Markley, testified that when she

and defendant arrived at the party, defendant was paged by Horton. She

overheard defendant tell Horton over the telephone to "bring the Ranger ***

in case there's trouble." Markley stated that defendant also told her he

expected to receive approximately $1,500 to $2,000. After Horton and Smith

arrived at the party, Markley testified, the three men stepped out to discuss

"business."

     According to Markley, she, defendant, Horton and Smith left the party in

Smith's car at approximately 2:30 a.m. The three men left Markley at a

parking lot where she was meeting a friend and defendant told her he would

return soon. Two hours later, the codefendants returned in Smith's car.

Horton was taken to his house and Markley saw him put a bag inside his parked

car at his home. Smith drove Markley and defendant to Markley's house.

Markley testified that defendant took something from the dashboard of the

car, which she believed to be food stamps because she later found $100 worth

of food stamps which were not hers. According to Markley, defendant told her

he was "going to jail now" but denied shooting anyone. Markley said she never

saw a gun during the evening.

     Codefendant Horton testified pursuant to a plea agreement under which he

was to receive no more than 80 years in prison. He stated that defendant's

reference to the "Ranger" in the telephone conversation was to indicate that

Horton should bring his .22-caliber pistol with him to the party. According

to Horton, defendant suggested that he, Horton and Smith rob Kunkle and

Houck. Horton claimed that defendant made reference to "cap[ping] the

faggots," which Horton understood as a reference to shooting them. Horton

admitted that he let defendant take Horton's gun from a green bag. He

testified that after the three codefendants took Markley home they drove to

a grocery store, where they discussed a plan to rob the victims. The men

drove back to Houck and Kunkle's apartment and induced them to come with them

in Smith's car by claiming that Markley and her girlfriend wanted to talk to

Houck and Kunkle.

     Horton's description of the shootings was similar to that of Houck's.

When the five men arrived at Big Island, all but Smith left the car.

According to Horton, defendant displayed the gun and ordered everyone to the

ground. Horton said that defendant shot both victims. However, he did not see

defendant take any food stamps from Kunkle or go through Houck's pockets.

Horton denied that he went through the pockets of either victim. On the way

back to the car, defendant told Horton, "I told you I could."

     Horton further testified that after the shootings Smith drove him home

and Horton put his green bag into his own car. The bag contained the gun,

shell casings, a rope, and a knife that Horton said he found in Smith's glove

compartment. Horton claimed that defendant threatened him to keep quiet but

also offered Horton food stamps and a wallet, which Horton said he did not

accept.

     Raymond Smith testified pursuant to a plea agreement under which his

prison sentence was not to exceed 30 years. He stated that he overheard the

two other defendants speak of "capping faggots," which Smith took to mean

that they were considering shooting someone. Smith claimed that Horton and

defendant planned the robbery and discussed beating the victims "if

necessary."

     Smith testified that he did not see what happened at Big Island, but

heard three gunshots after the others left the car and walked toward the

river. Smith did not see any gun, wallet, or food stamps. Although he assumed

that Horton's bag contained a gun, Smith claimed he did not know there was

going to be a shooting. Smith further stated that Horton and defendant

discussed food stamps and defendant offered them to Smith, who declined the

offer.

     After police spoke with Houck, defendant was arrested and given the

Miranda warnings. He then gave a tape-recorded statement to the police in

which he admitted accompanying the victims and the codefendants to Big Island

but denied that he intended to either rob or shoot them.

     At trial, defendant was the sole witness to testify for the defense. He

testified that Horton was the person who wanted to rob or shoot someone and

had mentioned such an idea to defendant days before the incident. Defendant

claimed he did not want to get involved. According to defendant, the plan of

returning to the victims' apartment after the party was Horton's. Defendant

said he stayed in the hallway while Horton asked the victims if they wanted

to go out for coffee. Defendant became aware that they were not going to do

so when the car passed a coffee shop and Horton directed Smith to Big Island.

When they arrived, Horton asked the others to get out because he wanted to

talk to them. Defendant testified that Horton pulled a gun out of his pants

and announced that he was an undercover cop "busting" them for drugs.

Defendant claimed he stood at least 120 feet away and did nothing as Horton

pushed the victims to the ground and shot them before going through their

pockets. As they returned to the car, Horton told Smith not to worry because

"dead men can't tell." Defendant denied offering Smith any food stamps and

insisted that Horton was the one who said, "I told you I could do it."

     According to defendant, he ended up with the stolen food stamps because

Horton had been wearing defendant's jacket at the time of the shootings and

had put the stamps in the pocket. At trial, defendant acknowledged that the

statement he had given to police was substantially correct and reiterated

that he was not the shooter.

     Under cross-examination, defendant denied having told Horton to "bring

the Ranger" when he called Horton at the party. Instead, he claimed, the

reference to "Ranger" was his request that Horton call the park ranger to

find out about camping charges. He denied telling Markley that he was going

to receive money that night and claimed that his comment to her about going

to jail did not refer to anything that he had done, but rather concerned what

Horton would claim. Although defendant continued to insist on cross-

examination that he had no preestablished intention to rob the victims, he

admitted that Horton had discussed beating them up and "capping some faggots"

or hanging them. Defendant admitted that Horton handed him the green bag but

denied seeing a gun in the bag. Defendant claimed he thought Horton was going

to beat up the victims at Big Island but not shoot anyone. Defendant also

acknowledged during cross-examination that he "knew where the gun was" when

Horton retrieved it from Horton's house before the shootings. Upon further

questioning by the court defendant claimed that on the way to the victims'

apartment, "We--it wasn't decided about robbing, but it was part of the

discussion about beating people up--nothing about as a robbery at that time."

     During closing argument the prosecutor emphasized that defendant's

testimony admitted guilt with respect to acts establishing his liability as

an accomplice. The prosecutor concluded that "[d]efendant had, basically,

confessed on the stand to felony murder."

     In his brief closing argument, defense counsel remarked that the case

was "interesting" and cited the absence of ballistics evidence. Counsel

mentioned the varying testimonies of defendant, Horton, and Houck regarding

which defendant had been the shooter and concluded, "If you pull it

altogether, I think they're all guilty of the same offense and should be

treated the same."

     Defendant was found guilty of all charges. The court found defendant

eligible for the death penalty based on the factors that the murder was

committed in the course of armed robbery and the murder was committed in a

"cold, calculated and premeditated manner." See 720 ILCS 5/9--1(b)(6),

(b)(11) (West 1992). The court ordered the preparation of the presentence

report and allowed the defense motion for psychological examination in

advance of the hearing in aggravation and mitigation.

     The presentence report revealed that defendant was under the care of Dr.

Peterson while in jail and had been seen by several doctors concerning his

mental health. He attempted suicide in 1988 and had one in-patient stay at a

mental health center. At the time of the presentence report, defendant stated

he was taking Thorazine for depression. The report indicated that since 1980

defendant had been treated by numerous doctors and had been prescribed

various medications including Ritalin, Lithium, Vestaril, and others.

     In aggravation the State offered testimony of two witnesses who

testified that defendant had been found guilty of battery in a 1983 juvenile

adjudication. In mitigation, defendant offered seven witnesses, including

various family members and friends, and Dr. Hauck, who examined defendant

after the trial court granted the defense motion for psychological

examination following trial.

     Defendant's mother and grandmother testified regarding his history of

psychiatric care, which apparently began in kindergarten. His mother

testified that defendant had been beaten by his father at a young age and

that defendant had been prescribed Lithium and other drugs for many years.

She found her son helpful and obedient around the house and said it was not

in his nature to harm anyone. Defendant's grandmother, who had often cared

for him as a child, corroborated the history of defendant's psychiatric care

and periods of hospitalization since kindergarten. She had not experienced

problems with defendant and believed his personality was that of a

"follower." She expressed shock at the charges.

     Defendant, who was 20 years old at the time of the crimes, told the

court of his remorse. He denied that he needed money at the time of the

attack on the victims, saying he went along with the other codefendants

because he "looked up" to them. He insisted he did not know a murder would

take place.

     Dr. Paul Hauck, a clinical psychologist, testified regarding his

clinical interview and testing of defendant. Dr. Hauck found defendant to

have an IQ of 76, in the bottom 6% of all people. This IQ placed defendant

only slightly above mental retardation. Dr. Hauck also found that defendant

was a paranoid schizophrenic who was delusional and who felt threatened

without reason, who tended toward alcohol dependency, and who was unable to

foresee the consequences of his actions. Dr. Hauck found defendant to be

anxious, submissive, and easily influenced by others. Dr. Hauck believed that

defendant's participation in the offenses was not rooted in hate or anger but

instead was based on defendant's attempt to go along with the crowd or

impress others. The doctor concluded that with maturity and time for

reflection, defendant could, in future years, be a positive member of

society. Dr. Hauck did not believe defendant was dangerous and expressed his

opinion that there was no purpose to be served by executing defendant, even

though Dr. Hauck asserted that he personally was in favor of the death

penalty in some cases.

     Defendant's former girlfriend, Jeanette Stone, the mother of their two-

year-old son, had lived with defendant for five years. She testified that he

had always treated her and their child well and had shared household

responsibilities and provided financial support. She testified that he feared

guns and never had one around their house.

     Darlene Bennet, a friend of defendant who had known him well for about

five years, testified that he was a trustworthy person around her grandson

and personal possessions.

     Defendant's uncle had employed defendant in his siding business and

described his successful job performance and attitude and his willingness to

take directions. He believed that defendant was a "follower" but one who was

a "good kid" who could be a decent member of society with the right

leadership.

     The trial court imposed the death penalty for the first degree murder

conviction and imposed prison terms for the other convictions.

                                    ANALYSIS

     Defendant initially raises two issues involving ineffective assistance

of counsel, both of which he argues independently establish sufficient

grounds for a new trial. First, he argues that his trial counsel's legally

erroneous theory of defense and admissions of defendant's guilt amounted to

the functional equivalent of a guilty plea without the procedural due process

required by Boykin v. Alabama, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709

(1969), and this court's Rule 402 (134 Ill. 2d R. 402). The sole defense

offered by counsel at trial was that defendant was not the actual shooter or

robber, which is not a legal defense to felony murder. See, e.g., People v.

Chandler, 129 Ill. 2d 233, 247-49 (1989); People v. Morgan, 67 Ill. 2d 1

(1977). In furtherance of such "defense," counsel allowed defendant to

confess on the stand to specific acts of participation in the criminal

undertaking, which established defendant's accomplice liability as a matter

of uncontested fact. Under the law, such admissions established defendant's

full criminal responsibility for the armed robbery, felony murder, and

attempted murder. Therefore, according to defendant, his counsel's

performance in this regard failed to subject the State's case to meaningful

adversarial testing required by the sixth amendment (see People v. Hattery,

109 Ill. 2d 449, 465 (1989), citing United States v. Cronic, 466 U.S. 648,

659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047 (1984)) and prejudiced

defendant by leaving the trial court with no choice but to convict defendant

of the underlying offenses, rendering him eligible for the death penalty

(Chandler, 129 Ill. 2d at 248). As a result, defendant argues, he was denied

effective assistance of counsel. See, e.g., Chandler, 129 Ill. 2d at 249;

People v. Hattery, 109 Ill. 2d 449, 465 (1989); cf. People v. Johnson, 128

Ill. 2d 253, 268 (1989).

     We express no opinion regarding the merits of this first claim of

ineffective assistance of counsel because it is unnecessary for the ultimate

resolution of this appeal. In our view, the second issue defendant raises,

challenging his counsel's failure to request a fitness hearing based on

defendant's use of psychotropic medication, is dispositive. Therefore, the

remainder of this opinion is directed to that issue.

     Defendant contends that he was denied due process of law and effective

assistance of counsel because he was not accorded the competency hearing to

which defendants are entitled by statute if they are taking psychotropic

medication under medical direction at or near the time of trial or

sentencing. 725 ILCS 5/104--21(a) (West 1992). In support, defendant cites

recent precedents of this court which have held that a defendant's right to

such hearing is one of legislative entitlement rather than judicial

discretion. See People v. Brandon, 162 Ill. 2d 450 (1994); People v. Gevas,

166 Ill. 2d 461 (1995); People v. Kinkead, 168 Ill. 2d 394 (1995).

     Under long-established principles of due process, an accused may not be

prosecuted or validly convicted if he or she is unfit to stand trial. E.g.,

Medina v. California, 505 U.S. 437, 440, 120 L. Ed. 2d 353, 359, 112 S. Ct.

2572, 2574 (1992); Drope v. Missouri, 420 U.S. 162, 172, 43 L. Ed. 2d 103,

113, 95 S. Ct. 896, 904 (1975). To secure this due process protection,

Illinois statutory and case law requires the trial court to hold a mental

competency hearing if there is a bona fide doubt concerning the defendant's

mental fitness to understand the nature and purpose of the proceedings and to

assist in his or her defense. 725 ILCS 5/104--10 (West 1992); People v.

Murphy, 72 Ill. 2d 421 (1978). In Gevas, the majority of this court held that

the terms of section 104--21(a) indicated that the "legislature has equated

the administering of psychotropic medication to a defendant with a bona fide

doubt as to fitness to stand trial." Gevas, 166 Ill. 2d at 469. Accord

Kinkead, 168 Ill. 2d at 407.

     In Brandon, this court held that a capital defendant who was taking

psychotropic medication while in jail awaiting trial was entitled to a

fitness hearing under the plain terms of the statute, and that his counsel's

failure to request such hearing constituted ineffective assistance of

counsel. In Gevas, the court adhered to its mandatory construction of section

104--21(a) and held that the trial court had a duty to hold a fitness hearing

when defense counsel, apprising the court of defendant's use of psychotropic

medications, requested such hearing pursuant to the statute. In both Brandon

and Gevas, this court granted the defendants new trials rather than remanding

the causes for "retrospective" fitness hearings because of the

impracticability of a meaningful hearing, retrospectively, on the issue of

the defendants' fitness at the time of trial and sentencing. See Gevas, 166

Ill. 2d at 471.

     To summarize current Illinois law, an accused who is taking psychotropic

drugs under medical direction at or near the time of trial or sentencing is

entitled to a fitness hearing under section 104--21(a). Brandon, 162 Ill. 2d

450; Gevas, 166 Ill. 2d 461; Kinkead, 168 Ill. 2d 394. Consistent with

principles of due process, if an accused who is entitled to a fitness hearing

is not accorded such hearing before being criminally prosecuted or sentenced,

the conviction ordinarily must be reversed and the cause remanded for further

proceedings. Gevas, 166 Ill. 2d 461; see also Brandon, 162 Ill. 2d 450; Drope

v. Missouri, 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896. In certain

circumstances, a limited remand to the circuit court may be ordered for the

purpose of determining whether factual grounds for a section 104--21(a)

competency hearing existed at the time of defendant's trial and sentencing.

Kinkead, 168 Ill. 2d at 417.

     The above authorities directly support defendant's contention that he is

entitled to relief based on the denial of his right to a fitness hearing. It

is uncontested in the record that Dr. Peterson prescribed Thorazine for

defendant while in jail. The presentence report and documents included in the

supplemental record indicate that defendant was taking psychotropic

medications during the time of pretrial proceedings in September 1993 and

throughout the January 1994 trial and death-eligibility sentencing

proceedings. According to records from the facility in which defendant was

incarcerated, defendant was initially prescribed Thorazine on September 14,

1993, and he was given 50 milligram dosages of the drug, to "continue

indefinitely." The records contain references to additional medications as

well. Therefore, it appears undisputed that defendant was taking psychotropic

drugs under medical direction during the time of his prosecution and

sentencing. Consequently, defendant was eligible for a fitness hearing

pursuant to section 104--21(a) and our precedents.

     We note parenthetically that the record reveals additional information

of potential relevance to the issue of defendant's mental competence. This

includes reference to defendant's chronic history of mental health problems

dating back to early childhood. Testimony of record indicates that from a

very early age defendant was given powerful medications for psychological or

behavioral problems. Although no evidence was adduced regarding defendant's

need for and use of psychotropic medications while in jail awaiting trial and

sentencing, Dr. Hauck's presentencing examination and testing of defendant

led to Dr. Hauck's opinion that defendant is a paranoid schizophrenic who

suffers from delusional thinking. Dr. Hauck was not requested to and did not

evaluate the separate issue of defendant's fitness to understand and assist

in his defense, and his examination of defendant did not occur until

approximately two months after defendant's trial.

     The State does not dispute the fact that defendant was taking

psychotropic drugs under medical direction during trial and sentencing.

However, the State takes the position, consistent with its past opposition to

our interpretation of section 104--21(a) in Brandon, Gevas, and Kinkead, that

this court should repudiate its three precedents as having created an

unwarranted rule of automatic reversal. In its place, the State suggests that

we now adopt a "totality of the circumstances" approach which would permit

us, as a reviewing court, to evaluate the trial record and independently

assess defendant's freedom from mental impairment. Under this approach, the

State proposes, we would review Dr. Hauck's testimony regarding defendant's

psychological state and analyze the trial transcript to form our own

impression of defendant's mental fitness. The State contends that during the

trial, defendant "gave a lucid, detailed recollection of his version of the

events leading up to the shootings, as well as the events leading up to his

arrest and his statement to police." Accordingly, the State concludes, "the

record on appeal is adequate to make a meaningful determination that the

medication Defendant was taking did not render him unfit for trial."

     We reject the State's invitation to make independent factual findings of

a predominantly medical nature based on a cold record that is totally silent

on the key issue of whether defendant's medications may have impaired his

fitness to understand and assist in his defense. The State cites no legal

authority for a court of review to venture down such an extraordinary path.

In fact, the majority of this court has squarely rejected the State's

argument that the trial court's observations of defendant's seemingly

cooperative deportment in court or lucid testimony dispenses with the need

for a fitness hearing where psychotropic medications are involved. In

Kinkead, 168 Ill. 2d at 410, we explained:

          "If personal observation were the decisive factor in whether to

          hold a section 104--21(a) hearing, the effects of psychotropic

          medications on a defendant's mental functioning would be left to

          speculation or uniformed opinion. Such a result would render the

          courts' application of section 104--21(a) directory rather than

          mandatory, which in turn would erode our precedent of Brandon and

          Gevas. We believe that the legislature intended, through the plain

          language of the statute, to remove the determination of a

          defendant's fitness from the subjectivity of personal observation

          and place the question in the formal context of a fitness hearing."

     The State does not argue that the record in the case at bar contains any

evidence of a medical nature respecting the influence that the psychotropic

drugs may have had on defendant's fitness at the time of his trial or

sentencing. Nor does the State dispute that defendant was medicated with

psychotropic drugs during that time. Therefore, under the terms of section

104--21(a) defendant was entitled to a fitness hearing. Defendant did not

receive a fitness hearing. His counsel did not request one. The court did not

order one. Therefore, consistent with our precedent, we hold that defendant's

conviction and sentence must be reversed and the cause remanded to afford the

State an opportunity to again try defendant.

     We are not persuaded by the State's alternative argument that we should

order a limited remand of this cause for the circuit court to hold a fitness

hearing on the issue of defendant's mental competency at the time of trial.

The State proposes a "full-blown inquiry into the properties of the drug in

question--whether it was properly prescribed, and whether it, in the dose

administered, could have affected the Defendant's ability to understand the

nature and purpose of proceedings and to assist in his defense." According to

the State, the perceived problems inherent in a retrospective competency

hearing would be minimized where the principal fitness issue relates to the

defendant's ingestion of psychotropic drugs. The State posits that in a

remand to assess the influence of such drugs on defendant, the principal

inquiry would involve the "science of pharmacology *** or pharmacokinetics,"

defined in the State's brief as the study of the absorption, distribution,

and metabolism of drugs in the body and their elimination from the body.

Because such an evaluation is "objective," the State argues, a hearing based

on the pharmacokinetics of the drugs in issue would avoid the perceived

problem that arises when an after-the-fact fitness assessment is premised

upon untrained laymen's personal observations or speculations respecting

defendant's trial demeanor.

     We express no opinion as to the relative scientific objectivity of

pharmocokinetics because we lack any particular knowledge of such field.

Presumably, the State is suggesting that on remand in the case at bar

evidence could be presented to assist the trial court in assessing

defendant's fitness at the time of trial through evaluating such "objective"

factors as the measurable rates of bodily absorption, metabolism, and

elimination of different drugs. While it may be true that such information

would be useful, we decline to speculate whether or not even objectively

measurable physical effects of potentially "mind-altering" drugs necessarily

resolve the influence such drugs may exert on a given defendant's

psychological state and ultimate fitness to understand and assist in his or

her defense. We find it inappropriate to remand the cause for a hearing into

the pharmocokinetics of the drugs involved as a means of determining

defendant's fitness retroactive to the time of trial.

     In light of our holding that defendant is entitled to a new trial, we

need not address the remaining issues presented in this appeal. We note that

defendant has not expressly challenged the sufficiency of his guilt, and we

observe that the evidence in the record is sufficient to support the

convictions and sentences. Consequently, there is no double jeopardy

impediment to a new trial and capital sentencing hearing. See People v.

Brown, 169 Ill. 2d 132, 169 (1996). We do not, however, imply that we have

made any findings regarding defendant's guilt or other issues that would be

binding on remand. See People v. McDonald, 125 Ill. 2d 182, 202 (1988).

     Finally, we reject defendant's challenges to the constitutionality of

the Illinois capital sentencing statute. Defendant argues that the statute

violates the eighth and fourteenth amendments by placing the burden of proof

on defendant which precludes meaningful consideration of mitigating evidence.

This court has rejected the same claim in many prior opinions (e.g., People

v. Edgeston, 157 Ill. 2d 201, 247 (1993)), and we will not now reconsider the

issue. Similarly, we have rejected on numerous occasions the argument that

the statute fails to include adequate safeguards to prevent arbitrary and

capricious death penalty decisions. E.g., People v. Sutherland, 155 Ill. 2d

1 (1992). We are not persuaded to revisit the issue, and we decline to

overrule the controlling precedents.

     For the foregoing reasons, we reverse defendant's convictions and

sentences and remand this cause to the circuit court for further proceedings

consistent with this opinion.

Reversed and remanded.

                                                                              

     JUSTICE MILLER, dissenting:

     I do not agree with the majority's conclusion that the defendant was

denied due process by the trial court's failure to hold, sua sponte, a

fitness hearing pursuant to section 104--21(a) of the Code of Criminal

Procedure of 1963 (725 ILCS 5/104--21(a) (West 1992)). Accordingly, I

dissent.

     The defendant in this capital case did not request a fitness hearing

while the matter was pending in the trial court. On appeal, the defendant now

contends that trial counsel was ineffective for failing to demand a fitness

hearing under section 104--21(a) and, further, that the trial court's failure

to conduct such a hearing in any event resulted in a denial of due process.

Without specifically resolving the defendant's claim of ineffective

assistance, the majority summarily concludes that the failure to hold a

fitness hearing in the trial court denied the defendant due process.

     Once more, the majority mistakenly equates a defendant's statutory

entitlement to a fitness hearing, found in section 104--21(a) of the Code of

Criminal Procedure, with a bona fide doubt of the defendant's fitness. See

People v. Kinkead, 168 Ill. 2d 394, 407 (1995); People v. Gevas, 166 Ill. 2d

461, 469 (1995). Moreover, the majority goes on to confuse the defendant's

failure to assert the procedures it believes are designed to secure due

process with a denial of due process itself. In doing so, the majority fails

to recognize that the statutory right to a fitness hearing in the

circumstances defined by section 104--21(a) is much broader than the

constitutional right with which it is mistaken. The statute grants to a

defendant an entitlement to a fitness hearing in cases in which the

constitutional right is not at all implicated. Under section 104--21(a), "[a]

defendant who is receiving psychotropic drugs or other medications under

medical direction" is entitled to a fitness hearing, even in the absence of

evidence that might otherwise trigger an inquiry into the separate

constitutional right. In this manner, the scope of the statute is

considerably broader than the bona fide doubt of fitness with which it is

equated. Presumably, the majority would grant the same relief to a defendant

who had been treated with a common antibiotic or analgesic during trial or

sentencing.

     At no time in the proceedings below did the defendant assert his

statutory right to a fitness hearing, and the trial judge denied him nothing

with respect to that right. Rather than being a question of due process, the

issue is properly analyzed in terms of ineffective assistance of counsel. To

prevail on a claim of ineffective assistance, the defendant must satisfy the

two-part test prescribed by the Supreme Court in Strickland v. Washington,

466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), by demonstrating both

a deficiency in counsel's performance and prejudice resulting from the

alleged deficiency. At a minimum, the defendant must show not simply that a

fitness hearing would have been conducted if counsel had requested one, but

that the outcome of the hearing would have been favorable to him.

     The majority perpetuates an unsound rule, ignoring the problems that

continue to arise from the ill-conceived decisions in Kinkead, Gevas, and

People v. Brandon, 162 Ill. 2d 450 (1994). As the majority notes, the

legislature has now amended section 104--21(a), severely limiting the

operation of the provision. This recent action suggests the legislature's

disagreement with the majority's prior interpretations of the statute.

Santiago v. Kusper, 133 Ill. 2d 318, 329 (1990). Today's result, however,

once more requires trial judges to make a special inquiry in every case to

determine whether, in the language of the statute, the defendant has been

"receiving psychotropic drugs or other medications under medical direction,"

and of conducting a fitness hearing sua sponte if such drug usage has

occurred. Contrary to accepted principles of waiver, the majority imposes

these extraordinary duties even though the defendant, who knows he has been

receiving medication, failed to invoke section 104--21(a) in the trial court.

I would reject the defendant's effort to transform the statutory right into

a constitutional right, and would address the remaining issues raised on

appeal by the defendant.

     CHIEF JUSTICE BILANDIC and JUSTICE HEIPLE join in this dissent.