THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY GILL, Defendant-Appellant.

First District (6th Division)   No. 1—97—3437

Opinion filed March 19, 1999.—Modified on denial of rehearing June 4, 1999.

24

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Kim A. Novi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant, Henry Gill, was charged with unlawful use of a weapon by a felon in violation of section 24—1.1 of the Criminal Code of 1961. 720 ILCS 5/24—1.1 (West 1992). After a bench trial, the trial judge found defendant guilty but mentally ill (GBMI) and sentenced him to a term of seven years' imprisonment. Defendant filed a timely notice of appeal and raises the following issues: (1) whether the amended insanity statute (720 ILCS 5/6—2 (West 1996)) applied to him; (2) whether he met his burden of proving that he was insane at the time of the incident; (3) whether the State proved beyond a reasonable doubt that he possessed an axe with intent to use it unlawfully; (4) whether he was entitled to a subsequent fitness hearing, after having

been found fit pursuant to a hearing, to address whether he received his medication; and (5) whether the finding of GBMI violates his due process rights.

STATEMENT OF FACTS

The following facts were adduced at trial.

Roy Wilson testified that at the time of the incident he was the assistant principal for the Gale Community Academy School (Gale School) located at 1631 West Jonquil Terrace in Chicago, Illinois. The school educates preschool through eighth-grade students.

Wilson stated that on June 1, 1995, at approximately 9 a.m., he was standing on the east side of Gale School along with approximately 400 students, who were in the process of lining up to be escorted into the building, when he saw defendant standing at a side entrance to the playground area. Defendant was holding a short-handled axe that had a wooden handle about 12 inches long and a silver hatchet blade. Wilson saw defendant begin to swing the hatchet from left to right and walk into the playground area. Wilson testified that he saw defendant strike one of the cement partitions located at the entrance to the playground with the axe at least three or four times. While defendant was swinging the hatchet, Wilson heard him say, "I am going to kill, kill all of you if I have to." Wilson stated that defendant also may have used profanity. At this time, defendant was within 2¹/₂ feet of Wilson with the children all around. Wilson placed himself between defendant and the children and yelled at the children to go into the building.

Wilson stated that no more than five minutes passed from the time defendant entered the playground to the time defendant left. When defendant left, he went north down Ashland on the sidewalk. Wilson directed someone to call 911. About 1¹/₂ minutes later, Officers Jim Byrne and Dan Herbert arrived and Wilson indicated to them the direction in which defendant headed. A short time later, the officers returned with defendant in the backseat of the police car and Wilson identified defendant.

On cross-examination, Wilson stated that defendant did not swing the hatchet at any particular person nor did defendant speak to any particular person.

Officer Herbert testified that at approximately 9:15 a.m., on June 1, 1995, he and his partner, Officer Byrne, responded to the disturbance at Gale School. After speaking with Wilson, Officer Herbert and his partner proceeded eastbound on Jonquil in their squad car to 1500 West Jonquil, where they located defendant attempting to conceal himself in between a row of bushes and in front of a house. They

instructed defendant to raise his hands and come out of the bushes, which he did. They told defendant he was under arrest. Defendant responded with "belligerent comments" and profanity. Officer Herbert believed that defendant was slightly intoxicated. The officers recovered an axe, approximately one foot in length, from defendant's front waistband. They placed defendant in the squad car and took him to Gale School where Wilson identified him as the person with the axe.

Thereafter, the officers took defendant to the police station where he was asked booking questions such as his name, birthday, address, and telephone number. Officer Herbert testified that defendant responded to all the questions. Officer Herbert spent about one hour with defendant and stated that he did not notice any unusual behavior other than the fact that defendant was using profanity.

After Officer Herbert's testimony, the trial court granted the State's request to admit into evidence a certified copy of defendant's prior conviction for attempted aggravated arson. Thereafter, the State rested.

Dr. Paul K. Fauteck, of the department of forensic clinical services of the circuit court of Cook County, then testified as an expert in forensic psychology on behalf of defendant. Dr. Fauteck stated that he first interviewed defendant on March 13, 1996, in order to make a report to the court as to defendant's fitness to stand trial and his sanity. Prior to interviewing defendant, Dr. Fauteck read a report that had been prepared by Dr. Michael Rabin, who had seen defendant on August 31, 1995. He also reviewed the police report as well as a report from a psychiatrist and a psychologist, who had seen defendant in 1993 on an unrelated matter.

Dr. Fauteck stated it was his opinion after interviewing defendant that defendant was insane at the time of the alleged offense based in part on the police report because it does not reflect "planful" organized action; rather, it describes a person who is "quite disorganized" and in a confused state of mind. In addition, during the interview defendant was "adamant" that his zip code in Evanston was 20201, rather than 60201, and that his arrest was invalid because the police were unaware of that fact. Dr. Fauteck stated this was evidence of confused, psychotic thinking. Dr. Fauteck further stated that if defendant was in such a state of mind after being in a "secure environment," there was no reason to think defendant was in any better state of mind at the time of his arrest. By "secure environment," Dr. Fauteck was referring to the fact that defendant had been in the Cook County jail from June 1995 until March 1996. Dr. Fauteck's diagnosis was that defendant suffered from an alcohol-induced persisting dementia that had developed over time.

Dr. Fauteck further testified that it was his opinion that at the time of the interview defendant was not fit to stand trial because of his confusion about the judicial process and his apparent inability to accept the reality of the charges against him and the possibility of a prison sentence. In addition, Dr. Fauteck stated that at the time of the occurrence and at the time of the interview defendant appeared incapable of appreciating the illegality of his conduct, was unable to conform his actions to the norm of society, and was insane.

On cross-examination, Dr. Fauteck stated that he reviewed the report of Dr. Rabin in evaluating defendant and acknowledged that his interview with defendant took place nine months after the incident, whereas Dr. Rabin's evaluation took place within two months after the incident. Dr. Fauteck acknowledged Dr. Rabin's opinion that defendant did not suffer from a mental disease or defect, was able to understand the criminality of his conduct, and was able to conform his conduct to the requirements of law. Dr. Fauteck also recognized that defendant has not been diagnosed with a psychosis, but stated that defendant has been diagnosed with a dementia. Dr. Fauteck also stated that a diagnosis of deteriorating alcoholic means that the person's mental functioning and physical state are deteriorating. Dr. Fauteck believed defendant had deteriorated.

Dr. Fauteck did not interview the arresting officers but did read the police report. The police report did not indicate that defendant was having delusions or hallucinations. In addition, in reaching his opinion, Dr. Fauteck had no knowledge of defendant's responsiveness during the booking process.

Since Dr. Fauteck's interview with defendant, defendant has been at Chester Mental Health Center where he was diagnosed with dementia due to a head trauma and substance abuse. Dr. Fauteck's focus was only on substance abuse. The medicine that defendant is on at Chester, Haldol, is used to treat alcohol abuse but it is also used to control psychotic behavior. Dr. Fauteck did not diagnose defendant with a psychosis and neither did Dr. Rabin or the doctors at Chester.

On redirect examination, Dr. Fauteck explained the difference between psychosis and dementia. He stated that the distinction between the two is very small. According to Dr. Fauteck, psychosis has many of the same characteristics as dementia. They are caused by different things but have "pretty much" the same result. For example, a person with dementia is more likely to have memory deficits whereas a person with schizophrenia, a psychosis, is more likely to have hallucinations. Dr. Fauteck stated if a person has substantial dementia, like defendant, he could have less ability to appreciate the illegality of his actions.

Dr. Fauteck stated that Dr. Rabin did diagnose defendant for dementia but found him able to appreciate the illegality of his actions. Dr. Fauteck also stated that Dr. Rabin concluded that defendant was not suffering from a mental disease or defect; however, it is Dr. Fauteck's opinion that this was a misstatement on Dr. Rabin's part because it is inconsistent to find that a person has an alcohol-induced persisting dementia and then find that the person does not have a mental disease or defect.

The defense rested and the State called Dr. Rabin in rebuttal. Dr. Rabin, a licensed clinical psychologist specializing in forensic psychology, testified that he examined defendant on August 31, 1995. He reviewed the records of the previous evaluations of defendant and the police report. Dr. Rabin testified that it was his opinion that on June 1, 1995, at the time of the offense, defendant was legally sane.

Dr. Rabin diagnosed defendant as having a persistent dementia related to an alcohol disorder and a history of head injuries. Dr. Rabin stated that dementia is a loss of cognitive ability due to some injury to the brain primarily characterized by memory problems and problems thinking, whereas psychosis is a mental disorder involving a loss of contact with reality. Dr. Rabin also stated that if dementia is severe it can cause a loss of reality. Dr. Rabin characterized defendant's dementia as "mild."

Dr. Rabin testified that defendant had the ability to understand the nature of the criminality of his acts and had the ability to conform his behavior to the requirements of law.

On cross-examination, Dr. Rabin stated that defendant suffers from mild dementia and that dementia is a mental illness and a mental defect but not a mental disease. At the time of Dr. Rabin's evaluation defendant was on baxteron; however, Dr. Rabin was unaware of this. Dr. Rabin stated that defendant showed signs of loss of cognitive ability, signs of memory problems, and was dysfunctional in his thinking.

At the conclusion of the trial, the trial court rejected defendant's insanity defense and found him GBMI. Defendant was sentenced to seven years in prison and now appeals.

## I. APPLICATION OF POSTAMENDMENT INSANITY LAW

Defendant argues that application of the newly amended insanity statute, which required defendant to prove insanity by clear and convincing evidence rather than by a preponderance, as was required under the preamended statute, violates the *ex post facto* clauses of the United States and Illinois Constitutions. U.S. Const., art. I, §§ 9, 10; Ill. Const. 1970, art. I, § 16. Defendant also contends that his trial counsel was ineffective for applying the recently amended insanity statute.

Initially, the insanity statute provided:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

\* \* \*

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity." 720 ILCS 5/6—2 (West 1992).

■ Subsequently, the statute was amended by Public Act 89—404 (Pub. Act 89—404, eff. August 20, 1995) as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct.

\* \* \*

(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by clear and convincing evidence that the defendant is not guilty by reason of insanity." 720 ILCS 5/6—2 (West 1996).

Thus, the amendment eliminated one of the prongs of the insanity definition and increased the defendant's burden of proof.

It is apparent from the record that trial counsel for defendant applied the newly amended version of the statute. He told the trial judge in closing argument:

"The first issue is whether or not we've shown by clear and convincing evidence that [defendant] is not guilty by reason of insanity.

\*\*\*

The issue here is whether or not at the time of the occurrence my client was in a position to appreciate the criminality of his acts \*\*\*."

It is also apparent that the trial judge likewise applied the newly amended statute. In finding defendant GBMI, the trial judge stated:

"Upon raising the defense of insanity, the burden is on the defendant to prove that the defendant suffered from a mental disease or defect and as a result of that, lack[ed] substantial capacity to appreciate the criminality of his conduct and the burden on the defendant is to show that by clear and convincing evidence."

Recently, however, the Illinois Supreme Court declared Public Act 89—404 (Pub. Act 89—404, eff. August 20, 1995), which amended this section, unconstitutional in its entirety for violating the single-subject

rule of the state constitution (Ill. Const. 1970, art. IV, § 8(d)). *People v. Reedy*, 186 Ill. 2d 1 (1999). As a result, the amended insanity statute was not in effect at the time of the occurrence, the time of trial, or the time of sentencing. Although Public Act 90—593 (Pub. Act 90—593, eff. June 19, 1998) subsequently reenacted the amendment to the insanity statute, it did so effective June 19, 1998, well after the trial.

Accordingly, as the amended insanity statute was not in effect at the time of trial, we find that its application to defendant constitutes reversible error and the case should be remanded for a new trial.

■ We reject defendant's contention that his trial counsel's belief that the amended statute applied constitutes ineffective assistance of counsel. At the time of trial (and prior to the *Reedy* decision), Public Act 89—404, which amended the insanity statute, was in effect. Although, generally, the law that was in effect at the time of the commission of the crime is controlling (*People v. DeSimone*, 67 Ill. App. 2d 249 (1966)), a defendant does not have an absolute right to be tried or sentenced under the law as it existed at the time of the offense. *People v. Starnes*, 273 Ill. App. 3d 911, 915 (1995). Procedural changes, even those that work to the disadvantage of a defendant, may be applied retroactively if they do not create a new offense or increase punishment. *Starnes*, 273 Ill. App. 3d at 915. While we express no opinion as to whether the amendment constitutes a procedural change, we cannot say that trial counsel's belief that the amended statute applied fell below an objective standard of reasonableness, as is required under *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984).

Accordingly, defendant's ineffective assistance of counsel claim must fail.

## II. PROOF OF INSANITY

Because we are remanding for a new trial, we need not address defendant's contention that the trial court erred in failing to find that he was insane at the time of the offense.

## III. PROOF OF INTENT TO USE WEAPON

Defendant's third contention is that the State failed to prove that he possessed the hatchet with intent to use it unlawfully against another. We disagree.

■ To sustain a conviction for unlawful use of a weapon by a felon under section 24—1.1 of the Criminal Code of 1961 (720 ILCS 5/24—1.1 (West 1996)), the State must prove beyond a reasonable doubt that defendant committed the crime of unlawful use of weapons (720 ILCS 5/24—1 (West 1996)) and that defendant had been convicted of a felony. *People v. Smith*, 148 Ill. 2d 454 (1992).

■ Pursuant to section 24—1(a)(2) of the Criminal Code of 1961, a person commits the offense of unlawful use of a weapon when he knowingly:

> "Carries or possesses with intent to use the same unlawfully against another, a dagger, dirk, billy, dangerous knife, razor, stiletto, broken bottle or other piece of glass, stun gun or taser or any other dangerous or deadly weapon or instrument of like character ***."

720 ILCS 5/24—1(a)(2) (West 1996).

■ In the case at bar, the assistant principal testified that defendant entered the school grounds, waved the hatchet around, struck the cement post several times and stated, "I'm going to kill, kill all of you if I have to." The principal also testified that defendant was only a few feet away from him and several children. We find that the words of the defendant, as well as his proximity to the principal and the children, evince an intent to use the hatchet unlawfully. Indeed, there is no requirement that defendant actually harm or strike anyone.

Defendant relies on *People v. Whitfield*, 8 Ill. App. 3d 210 (1972), and *People v. Sullivan*, 46 Ill. 2d 399 (1970), in support of his contention that the State failed to prove intent to use the weapon. However, both cases are distinguishable. In *Whitfield*, defendant was convicted of unlawful use of a weapon based on his use of a two-inch-wide leather wristband encircled with spikes. Defendant had slipped the band around his knuckles and raised a clenched fist at several people in a store. *Whitfield*, 8 Ill. App. 3d at 211. The appellate court reversed, finding no intent. The *Whitfield* case is distinguishable because the *Whitfield* defendant made no verbal threats and never attempted to enter the store; he remained on the curb 10 to 20 feet away. *Whitfield*, 8 Ill. App. 3d at 211. In the instant case, defendant was in close proximity to the principal and the children as he swung the axe from left to right. Moreover, he made verbal threats, saying he would kill all of them if he had to.

In *Sullivan*, pursuant to defendant's arrest for disorderly conduct, the police searched defendant and found a hunting knife. The supreme court reversed a conviction of unlawful use of weapons and found that the mere possession of a hunting knife late at night in a residential area was not enough from which to infer intent. *Sullivan*, 46 Ill. 2d at 402. Again, the case before us is clearly distinguishable based on the proximity of the children and the words and actions of the defendant.

Accordingly, we find that the State met its burden of proving defendant's intent.

IV. FITNESS HEARING

■ Defendant's next contention is that the State failed to prove

that he was "fit when tried." Due process bars prosecution of a person who is not fit to stand trial. *People v. Birdsall*, 172 Ill. 2d 464, 474-75 (1996). Defendant is presumed to be fit to stand trial and will be considered unfit only if, because of defendant's mental or physical condition, defendant is unable to understand the nature and purpose of the proceedings against him, or to assist in his defense. *People v. Griffin*, 178 Ill. 2d 65 (1997); 725 ILCS 5/104—10 (West 1992). The trial court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence. *People v. Burton*, 184 Ill. 2d 1, 13 (1998).

■ On April 9, 1996, after a hearing, the trial court found defendant unfit for trial and remanded to the Department of Mental Health.[1] Subsequently, on August 20, 1996, Dr. James Corcoran of forensic clinical services examined defendant and issued a report to the trial court that defendant was "fit to stand trial with medications." Defendant asserts that because the State did not prove that he had actually received the required medication prior to the trial, the case must be reversed and remanded.

On September 20, 1996, after Dr. Corcoran issued his report that defendant was fit to stand trial, the trial court conducted a second fitness hearing and found defendant "restored to fitness" and "fit to stand trial with medications." At the September 20 hearing, Dr. Corcoran testified that his diagnosis of defendant was that defendant suffered from dementia, secondary to multiple head injuries and alcohol. He stated that the symptoms include impairment in concentration and memory, confusion in thinking, and occasional auditory hallucinations. He testified that defendant was taking Haldol, which is an antipsychotic medication designed to alleviate auditory hallucinations, confusions and disorganized thinking, and Cogentin, which is designed to alleviate side effects from Haldol such as muscle stiffness. Dr. Corcoran stated that the medications would not hinder defendant's ability to stand trial; rather, they would enhance defendant's ability to cooperate with his defense counsel and to understand the nature and purpose of the proceedings against him.

Dr. Corcoran further testified that defendant was able to tell him the appropriate roles of the judge, State's Attorney, public defender and witnesses. Defendant also understood the plea bargaining process and the nature of evidence. Defendant told Dr. Corcoran that he was willing to assist his defense counsel with his defense. It was Dr. Corcoran's opinion that defendant was fit to stand trial. The trial judge agreed.

---

[1] Apparently, the April 9 proceeding was not made a part of the record on appeal.

Defendant appears to be advocating a *per se* duty upon the State to prove (and upon the trial court to inquire) whether a defendant has actually ingested required medication. However, defendant cites no cases that have so held. Our supreme court recently stated that, "[r]egardless of whether a defendant is taking psychotropic medication, the statutory requirements for fitness remain the same." *People v. Burton*, 184 Ill. 2d 1, 15 (1998). Defendant received the fitness hearing to which he was entitled. In the absence of any evidence of a *bona fide* doubt as to whether defendant understood the nature of the proceedings or of his ability to cooperate with counsel, defendant is not entitled to a third fitness hearing.

We find that defendant failed to raise a *bona fide* doubt as to his fitness to stand trial and, therefore, the trial court did not err in failing to *sua sponte* order a third fitness hearing. For the same reason, we find that defense counsel had no duty to request a third fitness hearing; therefore, his failure to do so does not constitute deficient representation and defendant's claim of ineffective assistance of counsel must fail. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 524-25 (1984).

## V. CONSTITUTIONALITY OF GUILTY BUT MENTALLY ILL (GBMI) STATUTE

■ Defendant's final contention is that the GBMI statute (725 ILCS 5/115—4(j) (West 1996)) violates due process in two separate respects. First, defendant asserts that the GBMI statute encourages compromise guilty verdicts. Second, defendant asserts that the GBMI statute imposes conflicting burdens upon defendant.

The supreme court recently addressed this issue in *People v. Lantz*, 186 Ill. 2d 243 (1999). The court rejected arguments identical to those put forth by defendant here and concluded that the GBMI statute is constitutional. *Lantz*, 186 Ill. 2d at 258-62.

Accordingly, based on *Lantz*, we reject defendant's contention that the GBMI statute is unconstitutional.

## VI. PETITION FOR REHEARING

Defendant Henry Gill has filed a petition for rehearing requesting that we reach the question of whether the defense proved at the bench trial, by a preponderance of the evidence, that he had been insane at the time of the offense.

Defendant relies on *People v. Taylor*, 76 Ill. 2d 289, 309 (1979), wherein the supreme court stressed that when an appellate court reverses a criminal conviction and remands for a new trial without

deciding a defendant's contention that the evidence at the first trial was insufficient, the court risks subjecting defendant to double jeopardy.

■ Accordingly, we have considered the evidence presented at trial and concluded that the trial judge could have properly found defendant guilty but mentally ill. Of course, we are not making a finding as to defendant's guilt or innocence that would be binding on retrial, but rather, we consider the evidence in order to protect defendant's constitutional right against double jeopardy.

## VII. CONCLUSION

Accordingly, this case is hereby reversed and remanded for a new trial. The petition for rehearing is denied.

Reversed and remanded.

CAMPBELL, P.J., and QUINN, J., concur.