Docket No. 75236–Agenda 1–May 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SCOTTY LEE KINKEAD, Appellant.

Opinion filed May 21, 1998.

JUSTICE McMORROW delivered the judgment of the court:

In a prior decision of this court we ordered a limited remand of this cause to the circuit court of Mason County, but retained jurisdiction over this direct capital appeal. 
People v. Kinkead
, 168 Ill. 2d 394 (1995) (
Kinkead I
). The purpose of the remand was to permit a fuller determination of the circumstances surrounding defendant's ingestion of psychotropic medication during the time of his guilty plea and sentencing.

In the original proceedings in the circuit court, defendant, Scotty Lee Kinkead, pleaded guilty to first degree murder and other offenses. He had initially accepted a plea offer from the State that would have enabled him to plead guilty to felony murder rather than intentional murder and that would have spared him the death penalty. Subsequently, he changed his mind and, despite the advice of counsel, informed the court that he wished to plead guilty to all charges and face the death penalty. Defendant had a history of suicide attempts and self-mutilation, and his presentencing report revealed that while he was in jail, defendant was being administered Thorazine, an antipsychotic medication. During sentencing, defendant asked the court to impose the death penalty, and the court complied.
 Kinkead I
, 168 Ill. 2d at 405.

In his original appeal to this court, defendant raised several issues, including his alleged lack of mental fitness to make informed decisions about his plea agreement and sentencing. According to defendant, he was denied due process of law because he was convicted and sentenced without a fitness hearing despite the fact that he had been given psychotropic medication during the plea proceedings and during sentencing. See 725 ILCS 5/104–21(a) (West 1994). Although the record in 
Kinkead I
 indicated that defendant had been given chloropromazine (brand name Thorazine) during his incarceration, we could not determine with reliability whether his ingestion of the psychotropic medication was near enough in time to his plea and sentencing to trigger the right to a fitness hearing under section 104–21(a) of the Code of Criminal Procedure of 1963. See 
Kinkead I
, 168 Ill. 2d at 414. We determined that we should not automatically grant a new trial on the record before us, but we also observed that it would be unfair to affirm defendant's conviction and sentence if he had been entitled to a fitness hearing pursuant to section 104–21(a). We concluded that “a limited remand for clarification of the circumstances surrounding defendant's use of psychotropic medications strikes the proper balance in the case at bar.”
 Kinkead I
, 168 Ill. 2d at 415.

On remand, the circuit court conducted a hearing and made certain findings. At the close of evidence, the judge announced that he was not ruling upon ultimate issues concerning defendant's fitness at the time of his plea and sentencing, or whether the failure of defendant's trial attorney to request a fitness hearing constituted ineffective assistance of counsel. The judge stated that he would instead “make findings of facts and the [Illinois Supreme Court] can draw what it wants from the findings.” In his written findings, the judge summarized the procedural history of the matter. Without citing to specific evidence on which he relied, the judge stated his belief that the effect of the Thorazine administered to defendant during the relevant times “appeared to be not medically significant.”

Pursuant to this court's remand order, the circuit court then ordered the clerk of the circuit court of Mason County to certify a copy of the circuit court's memorandum of opinion and findings to this court. We granted both parties leave to file supplemental briefs in this court on the issues raised by the remand hearing.

BACKGROUND

On March 26 and 27, 1996, pursuant to this court's remand, the circuit court held an evidentiary hearing on the issues relating to defendant's ingestion of psychotropic medication in 1992, while he was incarcerated and awaiting trial and sentencing. Prior to the presentation of witnesses, defense counsel moved for the entry of a directed finding based on the uncontested evidence, found in the jail medication logs and similar documents, that defendant was taking psychotropic medicine during the time he entered his guilty plea and was sentenced. According to this uncontested evidence, defendant was prescribed a dose of 100 milligrams of Thorazine each day from June 20, 1992 through July 17, 1992; from July 20, 1992, through September 26, 1992; from September 28, 1992, through October 31, 1992, and from November 2, 1992, through November 4, 1992. On November 11, 1992, November 13 through 21, 1992, and from November 23 through November 30, 1992, defendant took 50 milligrams of Thorazine daily.

At the time of defendant's original trial proceedings, while he was taking daily doses of 100 milligrams of Thorazine, he initially accepted then rejected the State's offer under which he would plead guilty in exchange for a sentence other than death. On October 19, 1992, defendant informed his counsel he had changed his mind, and, in open court, defendant rejected the State's offer. Two days later, again in open court, defendant repeated his decision to plead guilty to all charges and to receive the death penalty. Although defendant was being administered Thorazine at the jail during this time, such fact was not known to the court or the attorneys. No fitness hearing was requested or ordered. Instead, the trial court stated its belief, based on its in-court observation of defendant, that defendant was competent to proceed with the guilty plea and sentencing. At the sentencing hearing, on November 23, 1992, defendant again asked the judge to impose the death penalty. As the record on remand establishes, defendant was also taking Thorazine at the time of sentencing.

Notwithstanding the above, uncontested evidence, the circuit court denied defendant's motion for a directed finding that he should have received a fitness hearing in 1992 pursuant to section 104–21(a). The court also denied defendant's motion to limit the scope of the remand hearing so as to preclude evidence of the effects of Thorazine. The trial judge stated that he would allow a broad range of evidence because he was uncertain what the Illinois Supreme Court intended for the scope of the hearing to be on remand.

On the first day of the remand hearing, defense counsel moved to exclude one of the State's experts, Dr. Shillcutt, on the ground that the defense had not received notice that he would testify until 30 minutes before the hearing. The witness had not submitted a report and defense counsel had no notice of the substance of his testimony or expert opinions. The trial court recognized that the lack of adequate notice put the defense at a disadvantage, but provisionally denied the motion to exclude, directing that the defense be given an opportunity to interview Dr. Shillcutt before he testified.

The court also denied the defense motion to exclude medical opinion testimony by nonexpert witnesses, such as jail personnel and defendant's trial attorneys. The court permitted the defense request for a standing objection to testimony regarding defendant's demeanor, mood, and mental functioning.

The State's first witness, Curtis Eugene Pierce, was the jail administrator for the Fulton County jail, where defendant was incarcerated from March to November 5, 1992. Pierce had known defendant for several years prior to defendant's arrest for murder. According to Pierce, defendant exhibited no unusual behaviors or physical problems from March to June 20, 1992. Pierce characterized defendant's behavior and demeanor as “normal.” However, after June 1992 (the period which corresponds to defendant's receipt of regular doses of Thorazine), Pierce detected a change in defendant's behavior in the form of “cockiness,” disrespect, and irritability. Pierce had no involvement in any medical decisions and did not discuss defendant with Dr. Lee, the physician for the Fulton County jail who prescribed the psychotropic medication.

Leland Keith was the chief deputy sheriff for Mason County at the time defendant was transferred from Fulton County to the Mason County jail. Keith testified regarding the medical distribution record which listed the days on which defendant received Thorazine. In Keith's opinion, defendant did not display any unusual or bizarre mannerisms and appeared “normal.” However, he admitted he did not know defendant and had nothing against which to compare his behavior. Keith conceded that defendant never was examined by either a medical doctor or a clinical psychologist while at the Mason County jail. Keith stated that he was aware that defendant was a suicide risk based on his past history.

The State's next witness, Gale Carper, was one of defendant's two trial attorneys. Carper, who had assisted Alesia McMillen in the defense, first met defendant in the summer of 1992. She estimated meeting with him at least 10 times for periods of varying duration. Defendant sometimes seemed to understand their discussions and at other times did not seem to understand. Although she did not observe any bizarre behavior, she noticed his inability to focus at times, to follow conversations, and to make eye contract. He appeared confused about what could happen to him, and initially he stated that he could not be executed because Illinois did not have a death penalty statute.

According to Carper, in the fall of 1993, she, McMillen, and defendant discussed the plea negotiations and his decision to reject the State's offer for life imprisonment rather than the death penalty. Carper testified that defendant appeared to be very sad. He became adamant about requesting the death penalty. Subsequently, according to Carper, the attorney-client relationship between defendant and McMillen “became tense” for awhile. Asked to give a lay opinion as to whether defendant's will had become flattened, Carper agreed that his decision to seek death was more than just a change of mind. She said his desire for self-preservation disappeared. Carper also testified that if she had known defendant was taking Thorazine she would have recommended that a fitness hearing be requested.

Alesia McMillen, defendant's lead trial attorney, also testified. She described her meetings with defendant and stated that he appeared to understand some of the matters discussed while he had difficulties with others, such as the different stages of a capital case. She did not observe any unusual physical behaviors in her client. McMillen testified that she had requested a report in advance of trial from Dr. Day, a clinical psychologist, not because she believed that there was a question of fitness but because of the serious nature of the case, defendant's background, and the need to develop mitigation evidence. She was unaware that defendant was taking antipsychotic medication.

According to McMillen, during the plea negotiations, defendant expressed reservations about a natural life sentence and asked her to explore the possibility of a plea that would include a term of years rather than natural life. She told her client that they could request a sentencing hearing and seek a term of years. He agreed, and McMillen communicated the defense position to the prosecutor. The prosecutor agreed to permit defendant to plead guilty to one count of felony murder and to forgo asking for the death penalty. McMillen further testified that on October 19, 1992, the date on which both sides planned to present their plea agreement to the court, defendant told her he had changed his mind and preferred to plead guilty to all charges and be sentenced to death. She strongly advised against his decision, and stated she would not request the death penalty on his behalf. McMillen did not know that defendant was taking psychotropic medication. If she had known about the Thorazine she would have made further inquiry and requested assistance from a medical doctor.

The State called the following doctors to testify: Phillipp E. Bornstein, M.D., a psychiatrist; John R. Day, a psychologist; and Samuel Shillcutt, a neuropharmacologist. Dr. Bornstein's and Dr. Shillcutt's testimony was based solely on their review of records. Neither doctor met with or examined defendant. Dr. Day had met with defendant and administered tests in 1992, at the request of defense counsel, but did not perform a fitness evaluation.

Dr. Bornstein expressed agreement with Dr. Day's diagnosis that defendant suffered from a form of depression known as dysthymia, which is milder than major depression. The types of drugs Dr. Bornstein would prescribe for a depressed patient are antidepressants. Thorazine is not an antidepressant, but instead is an antipsychotic, “neuroplectic” drug that is normally used in the treatment of major mental disorders. According to Dr. Bornstein, it appeared in the instant case that Thorazine was prescribed as a sleeping aid. He testified that the drug is not habit forming and is used in prisons for insomnia and as a “chemical restraint” because it can diminish anxiety and cause sleepiness. Dr. Bornstein admitted that he would not ordinarily, as a clinician and psychiatrist, prescribe medication without consulting with the patient. He would not prescribe Thorazine in a clinical setting for insomnia, unless the patient was known to have insomnia-associated psychosis.

According to Dr. Bornstein, a psychotic person might receive a dose ranging from 200 to 400 milligrams at the lower end, up to 2,000 milligrams at the high end for an acutely agitated person. In Dr. Bornstein's opinion, a 100 milligram dose of Thorazine would not act as a major tranquilizer or an antipsychotic, but would induce drowsiness and reduce anxiety. Dr. Bornstein suggested that a reduction in anxiety would have been beneficial for defendant. However, Dr. Bornstein admitted that anxiety is not necessarily a bad quality when a person faces a difficult decision. He could not state whether a reduction in defendant's anxiety might have affected defendant's ability to make the life or death decision to seek the death penalty.

Dr. Bornstein stated his belief that in the dosages described in the instant case, Thorazine should not impair the ability of a person of average intelligence to make a logical decision. He further stated that the dosages that defendant received would not likely affect his judgment regarding the death penalty. However, when asked to state an opinion within a reasonable degree of medical and scientific certainty whether defendant's ingestion of the dosages of Thorazine during the relevant periods would have caused his judgment to be impaired in any respect, Dr. Bornstein stated, “That probably goes beyond what I could answer, all I can tell you.” He acknowledged that there may be certain risks and side effects even at the 100 milligram dose. He stated that there are idiosyncratic reactions that are not dose-related, such as reactions which might occur in a person with abnormal liver functioning. He said that if he were examining a person who, as in the instant case, had a history of self-mutilation and chronic substance abuse, Dr. Bornstein would make further inquiry upon learning that the person had sought to be put to death after initially accepting a life-saving guilty plea. However, Dr. Bornstein reiterated his belief that defendant's stated desire to avoid life in prison was a “logical” decision.

 Dr. Bornstein admitted that in the hundreds of times that he has testified regarding the fitness of a particular defendant, he has always personally consulted with such defendant. Dr. Bornstein stated that he would take into account many factors in a fitness analysis, including the person's intellect, psychiatric history, and memory. He would also seek information from family members, police reports, the defendant's counsel, and other materials. In the instant case, however, Dr. Bornstein did not meet or examine defendant, nor did he talk to defendant's trial attorneys.

 The State's next witness was Dr. Shillcutt, a neuropsychopharmacologist who was not disclosed as an expert witness until the day of the remand hearing. He explained that pharmacology is the study of the interaction between drugs and physiological systems such as the central nervous system. He testified that Thorazine is an antipsychotic drug which affects one's behavior or thought. It is primarily used in the treatment of psychosis, and is usually administered for that purpose in dosages ranging from 400 to 600 milligrams. Dr. Shillcutt stated that 100 milligrams is a low dose that generally would not have antipsychotic effects. However, according to Dr. Shillcutt, Thorazine “is a very dirty drug,” meaning that it “affects a lot of different body receptor types that have a wide range of physiologic consequences.” He described a wide range of side effects. Some of the effects occur at any dosage level, but generally such common signs as dry mouth and blurred vision are usually attenuated fairly quickly.

Over objection from the defense, Dr. Shillcutt testified that research conducted between 1955 and 1987 suggests that a 100 milligram dose would not have a measurable effect that would inhibit a person from making a reasoned judgment. A very young or old person might be affected more by the dosage than others. However, he acknowledged that all of his research on the effect of psychotropic medications was limited to people who are psychotic, and that such drugs are not ordinarily given to nonpsychotic individuals. Psychotropic medicine is also used to treat neurological or “movement” disorders, such as dystonia, but Dr. Shillcutt stated that “we do not fully understand the psychopathology of psychiatric illnesses as well as movement disorders.” He would not ordinarily recommend treating insomnia with Thorazine, nor would he recommend that drug for treating anxiety reaction or depression.

Dr. Shillcutt admitted that if a person's liver function were impaired, such disfunction would affect that person's ability to metabolize a drug like Thorazine, even at the 100 milligram level. The drug is metabolized by the liver. He further agreed that a prolonged period of alcohol abuse, such as that in defendant's case, which began in childhood, could affect liver functioning. Impaired liver functioning in turn could increase the effects of the dosage of Thorazine given. Dr. Shillcutt testified that before he would render an opinion as to the effect of Thorazine in defendant's body, he would want to consider defendant's liver functioning. Dr. Shillcutt admitted he did not consider defendant's liver functioning in his opinion as to the effect of the dosage on defendant in the case at bar.

The State's next witness was Dr. Day, the clinical psychologist who had prepared a report for the defense prior to the plea agreement and who had testified at defendant's sentencing hearing. On the first date that defendant met with Dr. Day, on June 17, 1992, an associate of Dr. Day gave defendant the Minnesota Multiphasic Personality Inventory (MMPI), a psychological test. The MMPI did not register the use of psychotropic drugs because defendant was not yet taking Thorazine. At the time of the second and third interviews, in July and August 1992, respectively, defendant was taking the medicine, but Dr. Day was unaware of that fact. Dr. Day was not requested to perform a fitness examination, but instead was requested to determine whether defendant had any psychological processes that would inhibit the development of a defense and whether such processes would have explained some of his behavior.

Despite the fact that Dr. Day did not perform a fitness evaluation in 1992, at the remand hearing in 1996 he was asked to give his opinion as to defendant's competency to assist in his defense at the time of the plea proceedings and sentencing. Over defense objections based on relevance and on the fact that retrospective assessments of fitness are prohibited by due process concerns, Dr. Day stated his opinion that defendant understood the nature of the charges against him and was able to cooperate in his defense. The court sustained an objection to the witness' rendering an opinion as to whether defendant's judgment had been impaired by the Thorazine he was taking in the summer of 1992. Dr. Day stated that when defendant's trial counsel told him in October 1992 that her client had decided to seek the death penalty, rejecting the State's plea offer, Dr Day was “thunderstruck.”

Dr. Day acknowledged that patients who express a desire to commit suicide may be suffering from mental illness, extremely poor judgment, or severe depression. Dr. Day stated that he would be quite concerned about the mental competence of a suicidal person. He admitted that if such a person was taking Thorazine, that fact would “certainly” cause increased concerns about the person's thought processes. Dr. Day testified that when he learned of defendant's decision to reject the live-saving plea bargain, he viewed it as “a change from all of the hours of previous interaction.” Dr. Day stated that it would be “very important” to explore defendant's decision, “particularly in light of the long history of self-mutilation.”

The State presented no additional witnesses. On the second day of the remand hearing, March 27, 1996, the defense called Michael Gelbort, a clinical psychologist with a practice in neuropsychology. His practice includes therapy and evaluations of patients referred by psychiatrists, psychologists, and others. He has studied the drugs which affect cognition, or thought processes, including Thorazine. According to Dr. Gelbort, even in low doses, Thorazine decreases the level of arousal in a person through the alteration of brain chemistry.

In September 1995, pursuant to a request from defendant's counsel, Dr. Gelbort conducted a psychological examination of defendant and prepared a neuropsychological evaluation report. He interviewed defendant and reviewed records. An assistant to Gelbort also administered a psychological battery of tests. After analyzing the interview, test data, and records, Dr. Gelbort found that defendant exhibited a number of factors that were “highly correlated with cognitive disfunction *** dating from childhood.” Specifically, there was a long history of alcohol abuse (since age 12) and indications of physical abuse, including repeated blows to the head. From this history, Dr. Gelbort concluded that neurological testing was warranted, in order to assist in determining whether defendant's thought processes would be characterized as normal or abnormal. Also relevant would be defendant's educational history and learning disabilities.

Dr. Gelbort found from his testing that defendant was not psychotic, which, he stated, has “clear-cut implications for the effect of something like Thorazine.” He testified that when antipsychotic drugs are given to persons who are not psychotic, the effect is to relax the person and suppress cognition, including reasoning, judgment, and problem solving. Dr. Gelbort acknowledged that a 100 milligram dose could be used as a sleep aid, but that it would also suppress cognition and cause a person to be less aware of the implications of his or her decisions. He stated that a person taking this dosage level could interact and appear mostly normal, but the drug would have the invisible effect of causing the person to “think more slowly, be less aware of implications, to have more difficulty holding down multiple ideas in mind at the same time, which is essential to reasoning and judgment.” Dr. Gelbort expressed his opinion that a person who is taking 100 milligrams of Thorazine “definitely” should be examined to determine fitness before entering a plea to a capital charge. Although a person taking the drug for a long time may develop a certain level of tolerance, Dr. Gelbort stated that the phenomenon of tolerance “absolutely” does not mean that cognition is not affected by the drug.

Significantly, according to Dr. Gelbort, Thorazine would have a more pronounced effect on an injured brain. In the instant case there was evidence that defendant was brain damaged. Dr. Gelbort found that defendant suffers from impaired judgment and problem solving, learning disabilities, and difficulty in focusing and concentrating. The tests he performed showed that defendant's brain disfunction was longstanding.

Dr. Gelbort also testified that the report prepared by Dr. Day was “fairly narrow” in scope because it did not look at a wide range of psychological factors. In contrast, Gelbort's analysis and report included cognition and thinking skills. Dr. Gelbort observed that the testimony of Dr. Bornstein on the effect of Thorazine in general was accurate, but that it was not focused on the specific effects on the defendant in this case. Over objection by the State, Dr. Gelbort stated his opinion to a reasonable degree of psychological certainty that the course of Thorazine given to defendant at the time of the plea offer and rejection “would have had an effect on his thought process.” Such an effect might not be apparent to observers of the defendant, according to Dr. Gelbort, and testing would be necessary. Therefore, Dr. Gelbort concluded, a fitness evaluation of defendant at the time of his plea and sentencing would have been appropriate.

The circuit court entered a “Memorandum of Opinion and Certain Findings of Fact,” which was filed approximately two months after the remand hearing. In the opinion, the court acknowledged that it had

“expand[ed] the scope of the hearing, receiving evidence not only on those basic points raised, but also upon the question of the effect of Thorazine upon a given recipient. The Court further received evidence bearing on the physical and mental condition of the Defendant during the time in question. This court expanded the hearing because [it] is uncertain precisely what facts the Illinois Supreme Court contemplated would be presented. This court feels the findings as set forth below will give the Illinois Supreme Court the information it requires to decide the issues as they define them.”

The circuit court stated its belief that the effect of the dosage given to defendant “appeared to be not medically significant.” The court did not explain the precise basis on which it reached this conclusion. However, the court opined that defendant had been suffering from anxiety because of his incarceration for murder and that he needed the medication to assist him in sleeping. The circuit court also made several observations about whether a “gap” in the administration of the Thorazine to a person might result in a decreased tolerance for the medication upon its resumption. The court noted that there was no gap in the administration of the drug to defendant prior to the entry of the guilty plea but that there were gaps in the administration of the drug at the time of the sentencing. The court did not state what, if any, inferences were to be drawn from these “gaps,” but instead stated that “[t]here is no evidence to determine how long the gap in the administration of the medicine must be in order to cause a significant decrease in the tolerance level.” The circuit court summarized the events of the negotiated plea, and defendant's rejection of the State's offer to forgo the death penalty. According to the trial court, defendant's position at the time appeared “to be logical, even though not a position which the majority of persons under similar circumstances might be expected to take.” Without further discussion as to whether such decision might have been influenced by defendant's ingestion of antipsychotic medication, in light of the evidence adduced at the remand hearing, the circuit court simply concluded that the Thorazine “appeared not to have a medically significant effect.”

In his supplemental brief filed in this court, defendant cites precedent of this court in support of his argument that he should be granted a new trial because the circuit court found that he was taking Thorazine before and during the time he entered his plea of guilty and was sentenced to death. Defendant also contends that because the circuit court exceeded the limited scope of this court's remand order in 
Kinkead I
, we should disregard the circuit court's findings relating to the effect of Thorazine on defendant. Defendant further challenges the circuit court's conclusion that the dosages of Thorazine were not medically significant, stating that such conclusion is not supported by the evidence and should be rejected. Finally, defendant argues that the testimony of Dr. Shillcutt should have been excluded on the ground that the defense was not notified that he would testify until shortly before he took the witness stand.

The State argues that we should not grant defendant relief based solely on the fact he was taking antipsychotic medication during the time of defendant's plea and sentencing. Further, the State contends, the scope of the circuit court's hearing was appropriate in light of this court's remand order. The State also defends the circuit court's findings and argues that the court properly exercised its discretion in permitting Dr. Shillcutt to testify.

ANALYSIS

Initially, we note that the legislature has amended section 104–21(a) twice since the time of defendant's conviction. The first amendment to section 104–21(a) provided that no fitness hearing was required unless the court found that there was a 
bona fide
 doubt of the defendant's fitness. Pub. Act 89–428, §605, eff. December 13, 1995, amending 725 ILCS 5/104–21(a). This amendment was struck down by this court in 
Johnson v. Edgar
, 176 Ill. 2d 499 (1997), because it was included in a bill which violated the single subject requirement of the Illinois Constitution. 
Johnson
, 176 Ill. 2d at 505. The second, and latest, amendment to the statute provides that a defendant's lack of fitness shall not be presumed solely because of the defendant's receipt of psychotropic medications. Pub. Act 89–689, §90, eff. December 31, 1996, amending 725 ILCS 5/104–21(a). The State contends that the most recent amendment to section 104–21(a) should be applied in the instant appeal. 

Subsequent to the filing of the supplemental briefs in the case at bar, this court issued its opinion in 
People v. Cortes
, 181 Ill. 2d 249 (1998). In 
Cortes
, we unanimously concluded that the most recent amendment to section 104–21(a) should not be given retroactive application in a case involving a direct appeal. 
Cortes
, 181 Ill. 2d at 275 n.2. In reaching this conclusion, we relied upon 
People v. Birdsall
, 172 Ill. 2d 464 (1996), a decision in which this court determined that the first amendment to section 104–21(a) did not retroactively apply in a direct appeal. 
Birdsall
, 172 Ill. 2d at 475 n.1. 
Cortes
 seemingly disposes of the State's argument regarding the applicability of the current amendment to section 104–21(a) in the instant case. However, the State maintains that 
Birdsall
, the decision relied upon by 
Cortes
, is at odds with 
People v. Nitz
, 173 Ill. 2d 151 (1996), a decision of this court which was filed on the same day as 
Birdsall
. The State asserts that 
Nitz
 in fact supports its argument that the second amendment to section 104–21(a) should be retroactively applied in the instant appeal.

In 
Nitz
, this court considered whether the first amendment to section 104–21(a) could be retroactively applied in a post-conviction proceeding. In addressing this issue, we noted the general rule that “amendatory acts which are procedural in nature have retrospective operation for matters which are 
pending
 on the effective date of the amendment.” (Emphasis in original.) 
Nitz
, 173 Ill. 2d at 162. We then concluded that because the post-conviction proceeding before us was “a collateral matter, the amendment, though procedural in nature, does not apply.” 
Nitz
, 173 Ill. 2d at 162-63. Focusing solely on this language, the State maintains that 
Nitz
 holds that the first amendment to section 104–21(a) is procedural in nature and may be retroactively applied to cases pending on direct appeal. From this, the State reasons that the holding in 
Nitz
 is contrary to 
Birdsall
, and that the result reached in 
Birdsall
 (and by extension, 
Cortes
) is incorrect. The State recognizes that the amendment to section 104–21(a) which was at issue in 
Nitz
 and 
Birdsall
 no longer exists. However, the State contends that the 
Nitz
 opinion's determination that the first amendment was procedural in nature is equally applicable to the latest amendment to section 104–21(a). See, 
e.g.
, 
People v. Perry
, 292 Ill. App. 3d 705, 717 (1997); but see 
People v. Jamerson
, 292 Ill. App. 3d 944, 948 (1997) (concluding that the discussion in 
Nitz
 regarding the procedural nature of section 104–21(a) is 
dicta
). Thus, the State argues that the second amendment to section 104–21(a) is procedural in nature and should be retroactively applied in the instant, direct appeal. We disagree.

The State finds a conflict between 
Nitz
 and 
Birdsall
 because it fails to consider the entirety of the 
Nitz
 opinion. In the same paragraph in 
Nitz
 in which we determined that the first amendment to section 104–21(a) was procedural in nature and could not be retroactively applied in a collateral proceeding, we went on to conclude that, wholly apart from the question of whether the first amendment was procedural or substantive, giving the amendment retroactive application would violate the principle of separation of powers. We observed that “while the General Assembly can pass legislation to 
prospectively
 change a judicial construction of a statute if it believes that the judicial interpretation was at odds with legislative intent, it cannot effect a change in that construction by a later declaration of what it had originally intended. See 
People v. Rink
, 97 Ill. 2d 533, 541 (1983); 
In re Marriage of Cohn
, 93 Ill. 2d 190, 202-04 (1982); 
Roth v. Yackley
, 77 Ill. 2d 423, 428-29 (1979).” (Emphasis added.) 
Nitz
, 173 Ill. 2d at 163. Our conclusion in 
Nitz
 that giving retroactive application to the first amendment to section 104–21(a) would violate the Constitution is as relevant to our resolution of the instant appeal as is our discussion in 
Nitz
 regarding the procedural nature of the first amendment. Based on the separation of powers issue, 
Nitz
 and 
Birdsall
 are consistent, and our unanimous decision in 
Cortes
 stands uncontradicted and undisputed.

Cortes
, 
Birdsall
 and 
Nitz 
establish that the second amendment to section 104–21(a) may not be given retroactive application. We see no reason to depart from these recent precedents, particularly in this case, where our remand order was directed solely to whether defendant was entitled to a competency hearing under the original version of section 104–21(a) (
Kinkead
, 168 Ill. 2d at 417), and where the remand order was issued long before the latest amendment to section 104–21(a) became effective.

The ultimate legal issue in this appeal is whether defendant is entitled to a new trial, under the specific circumstances of this case, because he did not receive a fitness hearing before his conviction and death sentence. To answer this question we review the general due process principles which are implicated in a post-trial inquiry into fitness issues, the evolving legal standard developed by recent precedent of this court, the purpose and scope of the remand hearing in the case at bar, and the evidence adduced at that hearing.

Due process of law prohibits the conviction and sentencing of a person who is incompetent to stand trial. See, 
e.g
., 
Drope v. Missouri
, 420 U.S. 162, 172, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904 (1975); 
People v. Brandon
, 162 Ill. 2d 450 (1994). Fitness “refers to a defendant's ability to understand the nature and purpose of the proceedings and to assist in the defense.” 
Kinkead I
, 168 Ill. 2d at 407. Under Illinois statutory law, fitness is presumed. However, the circuit court has a duty to order a fitness hearing where there exists a 
bona fide
 doubt of the competence of a defendant. 725 ILCS 5/104–10 (West 1992). In general, the determination that there is a 
bona fide
 doubt of a defendant's competence rests within the sound discretion of the circuit court. Nevertheless, this court has held that a defendant's right to a fitness hearing pursuant to the version of 104–21(a) in effect at the time of defendant's conviction is a matter of legislative entitlement rather than judicial discretion. See, 
e.g
., 
Brandon
, 162 Ill. 2d at 460-61; 
People v. Gevas
, 166 Ill. 2d 461, 469 (1995); see also 
Kinkead I
, 168 Ill. 2d at 409-10.

In 
Brandon
, this court ordered a new trial where the defendant's trial counsel had failed to request a fitness hearing pursuant to section 104–21(a), even though defendant was being administered psychotropic medications at the time of his trial and sentencing. Although three members of this court dissented on the ineffective-assistance-of-counsel issue, the dissenters did not dispute the majority's construction of the statutory language as mandatory; 
i.e
., that an accused taking psychotropic medication at or near the time of trial or sentencing was 
entitled
 to a fitness hearing. See 
Brandon
, 162 Ill. 2d at 461 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).

In 
Gevas
, a majority of this court followed the reasoning of the 
Brandon
 decision and held that where the trial court had been informed of the defendant's ingestion of psychotropic drugs during the proceedings but refused to grant counsel's request for a fitness hearing pursuant to the statute, reversal and remand was required. 
Gevas
, 166 Ill. 2d at 467-68.

In 
Kinkead I
, 168 Ill. 2d at 407, we quoted with approval the statement of the 
Gevas
 court that “ `[t]he legislature has equated the administering of psychotropic medication to a defendant with a 
bona fide
 doubt as to fitness to stand trial.' ” Citing to 
Brandon
, we concluded in 
Kinkead I
 that trial counsel's failure to request a fitness hearing under the statute did not waive the issue (
Kinkead I
, 168 Ill. 2d at 406), and that because the trial court had notice from the presentencing report that defendant was receiving psychotropic medication, the court had a duty to further investigate defendant's fitness for trial. 
Kinkead I
, 168 Ill. 2d at 406-07, citing 
Gevas
, 166 Ill. 2d at 469. However, we declined to order a new trial on the record before us. Because the incomplete state of the record did not allow this court to ascertain whether, in fact, defendant's use of Thorazine was sufficiently proximate in time to his plea proceedings and sentencing, we ordered the cause remanded for a supplemental hearing. 
Kinkead I
, 168 Ill. 2d at 417.

Subsequent decisions of this court followed the rationale of 
Brandon
, 
Gevas
, and 
Kinkead I
. 
E.g
., 
People v. Birdsall
, 172 Ill. 2d 464 (1996); 
People v. Nitz
, 173 Ill. 2d 151 (1996). In 
Birdsall
, we reversed the defendant's convictions and death sentence where counsel was ineffective for failing to request a fitness hearing despite counsel's awareness that defendant was taking psychotropic medications and had a history of mental problems. In 
Nitz
, a post-conviction appeal, the defendant provided documentation of his claim that during his trial and sentencing he had been administered psychotropic medication, and that the State withheld such information. This court reversed the cause and remanded for a new trial on due process grounds. See also 
People v. Jones
, 291 Ill. App. 3d 231 (1996) (summarizing this court's cases involving section 104–21(a) hearings); 
People v. Guttierez
, 271 Ill. App. 3d 301 (1995).

The 
Brandon
 line of cases attempted to effectuate the express intent of the legislature–as reflected by the plain terms of the statute–and to provide a meaningful remedy to defendants who were entitled to, but who did not receive, fitness hearings based on their ingestion of psychotropic medications. In ordering new trials as the appropriate remedy, this court recognized that retrospective fitness determinations are inherently problematic and may implicate due process concerns. See 
Brandon
, 162 Ill. 2d at 459-60, citing, 
inter alia
, 
Pate v. Robinson
, 383 U.S. 375, 386, 15 L. Ed. 2d 815, 822, 86 S. Ct. 836, 842 (1966); 
Gevas
, 166 Ill. 2d at 471.

In recent opinions of this court, an exception to the rule of “automatic” reversal for new trial has been applied. See 
People v. Burgess
, 176 Ill. 2d 289 (1997); 
People v. Neal
, 179 Ill. 2d 541 (1997); 
Cortes
, 181 Ill. 2d 249. In 
Burgess
, the defendant requested a limited remand, similar to that ordered in 
Kinkead I
, before his direct appeal was heard by this court. During the remand hearing, evidence was presented indicating that the defendant, who had been taking psychotropic drugs during the proceedings, was not impaired by those drugs. In 
Burgess
, this court held that it was not required to ignore the supplemental evidence presented at the remand hearing, even if such evidence may have been beyond the scope of the remand order. Although the 
Burgess
 majority recognized that it could order an “automatic” new trial based on the 
Brandon
 line of cases, the court determined that “there will be some circumstances in which it can be said that the use of psychotropic medication did not affect the defendant's mental functioning in such a way that relief would be appropriate.” 
Burgess
, 176 Ill. 2d at 303. The 
Burgess
 court held that, “
at least in the present case
, there are sufficient reasons to depart from our previous practice of automatic reversal and to make a 
case-specific inquiry
 into the psychotropic drugs administered to this particular defendant.” (Emphasis added.) 
Burgess
, 176 Ill. 2d at 303. See D. Locallo, 
The Right to Fitness Hearings For Defendants on Psychotropic Drugs
, 85 Ill. B.J. 208 (1997).

In 
Neal
, this court followed the 
Burgess
 rationale and declined to grant the defendant a reversal and remand for new trial where the defendant, in his third post-conviction petition, presented evidence that he had been taking daily doses ranging from 25 to 75 milligrams of Thorazine before his pretrial suppression hearing. The circuit court conducted an evidentiary hearing on defendant's post-conviction petition, and found, 
inter alia
, that defendant had ceased taking the medication days before the suppression hearing, which was held approximately two months before the trial itself. The circuit court held that section 104–21(a) was not violated because the defendant's ingestion of the drug was not proximate in time to his trial. The circuit court further held that the evidence revealed no scientific basis to believe that the defendant was affected by the medication during his trial or sentencing. 
Neal
, 179 Ill. 2d at 547.

In affirming the circuit court's denial of the defendant's petition in 
Neal
, we analyzed our prior precedents involving section 104–21(a) fitness hearings. We noted that, until the decision in 
Burgess
, all of our cases involving the remedy to be granted where a person was deprived of a hearing to which he was entitled was to grant a new trial. We stated, “In 
Burgess
 we abandoned our prior view that retrospective fitness determinations were 
always
 improper. Instead, we held that a defendant who has been denied his right to a fitness hearing under section 104–21(a) is not entitled to a new trial if evidence subsequently presented to the court in a post-trial proceeding establishes that the defendant did not, in fact, suffer any impairment as a result of his ingestion of psychotropic medication. 
Burgess
, 176 Ill. 2d at 302-04.” (Emphasis added.) 
Neal
, 179 Ill. 2d at 552; see also 
Cortes
, 181 Ill. 2d at 276.

The above history of our cases demonstrates the inherent difficulties in attempting to apply a bright-line rule of law to specific factual circumstances involving defendants' fitness to stand trial. The bright-line or automatic reversal rule of the 
Brandon
 line of cases has been modified by the case-specific approach taken in 
Burgess
 and subesequent cases. We believe that the case-by-case approach comports with due process and does not impose an unduly restrictive burden on the State. In light of our case law, we conclude that defendant cannot prevail in his request for a new trial based solely on the fact that the evidence on remand showed that he had been receiving antipsychotic medication during his trial and sentencing proceedings.

Similarly, we reject defendant's challenge to the scope of the circuit court evidentiary hearing on remand. Because defendant believes that the circuit court's admission of evidence greatly exceeded the scope of the remand that was contemplated by this court's prior opinion in 
Kinkead I
. he contends that we should disregard certain evidence. Specifically, he argues that evidence which purported to show the effects of Thorazine on his mental functioning, mood, and demeanor should not be considered in determining whether he was entitled to a section 104(a)–21 fitness hearing. In the alternative, he argues that the evidence presented on remand does not support the circuit court's statement that the Thorazine given to defendant appeared to be “not medically significant.”

With respect to the issue of scope, we note that the circuit court did not limit its inquiry to our request for “the dates on which [defendant] received and ingested [psychotropic] medicine and whether the psychotropic drug treatment is linked closely enough to the time of defendant's plea of guilty and sentencing to have entitled him to a competency hearing pursuant to section 104–21(a).” 
Kinkead I
, 168 Ill. 2d at 417. There was, however, language in our opinion that may have suggested a broader inquiry on remand. See 
Kinkead I
, 168 Ill. 2d at 414-15. The circuit court allowed both sides latitude in presenting their evidence. In so doing, it appears that the court may have relaxed the rules of evidence in an effort to present this court with as much information as possible. For example, the court allowed lay opinion testimony from prison officials and defendant's trial counsel regarding the “normalcy” of defendant's demeanor, behavior, and perceived moods or mental functioning. In addition, the court permitted expert witnesses to give their opinions on the question of whether defendant, in his medicated state, was likely to have been impaired in his ability to reason and make judgments about his defense. However, we do not fault the circuit court's general approach in permitting each side to present a broad range of evidence relating to the effects of the regular dosages of Thorazine on defendant. The trial judge attempted to comply with this court's order and opinion, without benefit of precise guidelines or clear legal precedent. As such, the remand hearing was 
sui generis.
 Although some of the objections to the relevance of certain evidence may have been well-founded, we do not express an opinion as to any particular rulings of the circuit court in the case at bar. Nonetheless, in reviewing the evidence presented at the remand hearing we do not consider that which is not legally relevant to the ultimate issue before this court, 
i.e.
, whether defendant demonstrated that he is entitled to a fitness hearing.

To answer that question we state the legal standard for reviewing the 
sui generis
 remand hearing. In the instant case the circuit court was careful to acknowledge that the hearing on remand was 
not
 to be equated with a retroactive fitness hearing, and expressly stated that it was not “conducting a fitness hearing regarding the Defendant's fitness to stand trial at the time he entered his plea.” Accordingly, we do not review the circuit court's belief that the Thorazine appeared to be “not medically significant” as if such statement constituted a 
de facto
 competency adjudication that defendant was able to assist in his defense at the time he pleaded guilty and requested the death penalty. 
Cf
. 
Cortes
, 181 Ill. 2d at 271, 276; 
Burgess
, 176 Ill. 2d at 302-03. In addition, the circuit court did not reach legal conclusions regarding defendant's right to a fitness hearing. Instead, as the circuit court expressly observed, the ultimate determination of whether defendant should have received a fitness hearing at the time of his plea and sentencing is for this court to decide upon review of all relevant considerations. Consequently, we must determine whether the defendant has met the threshold criteria of establishing a 
bona fide
 doubt as to his fitness at the time of his trial or sentencing proceedings. See, 
e.g.
, 
Drope
, 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896.

In the case at bar, we believe that the supplemental evidence adduced at the remand hearing, along with other factors, establishes the existence of a 
bona fide
 doubt as to defendant's competency at the time he pleaded guilty and was sentenced to death. Accordingly, we reverse defendant's conviction and death sentence and remand for further proceedings. As explained below, we reach this conclusion based on the following considerations: (1) the circumstances surrounding defendant's ingestion of Thorazine distinguish this case from 
Burgess
, 
Neal
 and 
Cortes
; (2) the circuit court's belief that the Thorazine administered to defendant appeared to be not medically significant is not supported by the evidence in this case; and (3) defendant's decision to actively seek the death penalty is relevant to the 
bona fide
 doubt issue, especially in light of his history of self-mutilation, depression, and previous suicide attempts.

The circumstances of the instant case differ significantly from the cases in which this court has declined to order an automatic reversal for new trial. 
Neal
, 179 Ill. 2d 541; 
Burgess
, 176 Ill. 2d 289; 
Cortes
, 181 Ill. 2d 249. In 
Neal
, the defendant's use of psychotropic medications ended two months before trial. After an evidentiary hearing on the post-conviction petition, the circuit court held that the requirements of section 104–21(a) had not been violated because the defendant had failed to establish that his use of Thorazine was proximate in time to his trial. The instant case, in contrast, involves a defendant whose treatment with antipsychotic drugs was established to have occurred during his plea proceedings and sentencing. Accordingly, 
Neal
 is readily distinguishable from the case at bar.

The facts in
 Burgess
 also differ in significant respects from those in the instant case. In 
Burgess, 
we specifically cited as persuasive the concession of 
defendant's
 expert that two of the three psychotropic drugs given to defendant would not have had any effect on him, and that the bedtime doses would have dissipated by morning. (None of the medications were Thorazine). See also 
Cortes
, 181 Ill. 2d at 276 (affirming trial court's finding, made approximately one year after the defendant's trial and sentencing, that defendant was fit for trial “because, as in 
Burgess
, the evidence showed that the medication ingested by defendant did not have any effect on his fitness”). In contrast, in the case at bar there is no comparable evidence from any witness that the effects of the Thorazine would have dissipated overnight. Although there was testimony about a person's tolerance to the drug over time, that evidence was inconclusive and general. Moreover, Dr. Gelbort testified that people who reach a tolerance level for Thorazine continue to be influenced by the drug. In addition, there was substantial evidence in the instant case that defendant's physical condition, including brain damage and possible liver impairment, might have actually increased the effect of the antipsychotic medication administered to him.

Other evidence cited as persuasive by the 
Burgess
 court included testimony from defendant's trial counsel that defendant discussed all aspects of the defense and did not appear confused or otherwise impaired. In contrast, in the case at bar, the testimony of defendant's two trial attorneys, Carper and McMillen, indicates that defendant did not appear to understand certain matters relating to his defense. In addition, at times, defendant did not seem to be aware or focused during his meetings with defense counsel. According to Carper, defendant appeared to have given up any interest in self-preservation at the time he rejected the State's offer of life imprisonment. Both of defendant's trial attorneys testified that they would have taken additional measures had they had known that jail employees were administering psychotropic medication to defendant.

Another distinction between the testimony in the 
Burgess
 remand hearing and in the case at bar involves jail employees' personal observations of the defendants. In 
Burgess
 there was testimony indicating that the defendant was feigning a condition of shaking when jailers passed by his cell, after which he would return to his “normal” demeanor. In the case at bar, the prison administrator for the Fulton County jail, who knew defendant for years, testified that defendant's general demeanor appeared “normal” in the first weeks at jail but changed after June of 1992. The change he noted was a certain “cockiness,” irritability, or lack of respect. According to the uncontested records, June 20, 1992, was the date on which defendant began to receive Thorazine on a regular basis.

Testimony based on the personal observations of defense counsel and jail employees does not of itself indicate that defendant in the case at bar was impaired by the Thorazine. Nonetheless, it permits an inference that defendant might have been adversely affected by the medication, unlike the inference to be drawn from the observation evidence adduced in 
Burgess
.

Another distinguishing factor between this case and 
Burgess
 is the amount and nature of the medical evidence in the two cases. In 
Burgess
, the psychiatrist who prescribed the psychotropic drugs, Dr. Edwalds, testified that his purpose in giving them to the defendant was to assist him in sleeping. In the case at bar, however, the doctor who prescribed Thorazine to defendant did not testify. The State's expert witnesses, Dr. Bornstein and Dr. Shillcutt, never examined or even spoke to defendant. All of the doctors who testified in the instant case agreed that Thorazine is intended for treatment of major mental disorders and that its use as a sleeping aid in prisons does not conform to practice outside of prisons. Moreover, in the instant case the State's witnesses offered only generalized opinions as to the likely effect of a “low-end” dose of Thorazine on an 
average
 person who is neither very young or very old.

In 
Burgess
, a psychiatrist who testified in the defendant's behalf stated her belief that two of the drugs given to defendant at bedtime would not have had any significant effect on his mental state the next day. Although she also testified that the defendant might have been affected by an antidepressant, trazodone, there was virtually no other evidence that the defendant in 
Burgess
 was adversely affected by the psychotropic medication he had been given. In the case at bar, by contrast, there was substantial evidence of the possible adverse effects of Thorazine on defendant. Dr. Gelbort testified as to the battery of tests he performed on defendant and his assessment of defendant's medical and psychological history, his educational history, and his developmental history. In the opinion of Dr. Gelbort, the dosages of Thorazine given to defendant, a nonpsychotic individual, would have relaxed defendant, suppressed cognition, and caused him to have more difficulty with reasoning and exercising judgment. Dr. Gelbort testified that, in his opinion, a person taking 100 milligrams of Thorazine “definitely” should be examined for fitness.

We further observe that the medical testimony in the 
Burgess
 case did not address matters that are of specific importance to the particular defendant in the instant case, such as the effects of liver disfunction or brain damage on an individual's absorption of psychotropic medications. In the case at bar, Dr. Shillcutt acknowledged that if a person had an impaired liver functioning, the effect of the same doses of the drug could cause higher concentrations of the drug in the brain and consequently cause a person to be unable to track complex issues or otherwise suffer a disorder in thinking.

In light of the question raised about the significance of liver function in the metabolism of Thorazine, other evidence of record becomes significant, such as defendant's long-term abuse of alcohol, which began in childhood. Neither of the State's expert witnesses knew what defendant's liver functioning was, and therefore were unable to assess whether defendant's liver condition might have influenced the effects of the Thorazine on defendant's cognitive functioning. Finally, defendant's witness, Dr. Gelbort, testified that the effect of a 100 milligram dose of Thorazine could be increased by brain damage, and that defendant's tests revealed that he had suffered brain damage. Dr. Gelbort's opinion to a reasonable degree of psychological certainty was that the Thorazine given to defendant influenced his thought process.

We conclude that the remand hearing conducted in the case at bar gives rise to a significantly greater concern than existed in 
Burgess
, 
Neal
 or 
Cortes
, that the defendant's ingestion of antipsychotic drugs during the plea and sentencing proceedings influenced his decision-making abilities. Therefore, our conclusion that the defendants in those cases were not entitled to a new trial does not compel a similar conclusion in the case at bar. Indeed, in this case, much of the evidence appears to favor defendant's argument that the Thorazine he took may have influenced his ability to make a reasoned decision to plead guilty to greater charges and seek a sentence of death. Applying the case-specific approach of 
Burgess
 to the case at bar, we hold that the evidence on remand demonstrates a 
bona fide
 doubt of defendant's fitness to stand trial.

Finally, we note the additional factors which support our conclusion that defendant should have received a fitness hearing in 1992. Defendant requested the trial court to impose the death penalty, after having previously agreed to his counsel's negotiation of a life imprisonment sentence. As we noted in the prior opinion in this case, defendant has an IQ that is borderline retarded, he appeared to be learning-disabled, and had a history of self-mutilation as a child, as well as two suicide attempts. 
Kinkead I
, 168 Ill. 2d at 416. The “rationality” of defendant's decision to seek the death penalty instead of life imprisonment, while taking potent antipsychotic medications, should be considered in light of this history. See 
Kinkead I
, 168 Ill. 2d at 416.

For the reasons stated, we hold that defendant in the case at bar should have received a fitness hearing at the time he pleaded guilty and sought the death penalty. In light of the fact that five years have passed since the original proceedings, we further hold that a retrospective fitness hearing is inappropriate. 
People v. Neal
, 179 Ill. 2d 541 (1997). Accordingly, we reverse defendant's convictions and remand this cause to the circuit court of Mason County for further proceedings.

Reversed and remanded.

JUSTICE HARRISON, specially concurring:

This court decided 
People v. Brandon
, 162 Ill. 2d 450 (1994), fewer than four years ago and has been running from it ever since. The bright-line rule announced by that case and mandated by law has been replaced by a regime of exceptions and special circumstances. Everything, it seems, has become 
sui generis
. 
Stare decisis
 means nothing. 
People v. Burgess
, 176 Ill. 2d 289, 324 (1997) (Harrison, J., dissenting).

In the case before us today, the circuit court did exactly what my colleagues allowed the circuit court in 
Burgess 
to get away with. It exceeded the terms of our limited remand and conducted what amounted to a retrospective fitness hearing. Although the trial judge denied that he was “conducting a fitness hearing regarding the Defendant's fitness to stand trial at the time he entered his plea,” his characterization is immaterial. What matters is what the judge actually did, not what he said, and what the judge did here was ignore our directions on remand and convene a hearing that was in every meaningful way identical to a retrospective fitness hearing. The majority's suggestion that this was something other that a retrospective fitness hearing is as disingenuous as its pretense that 
Brandon
 has not been overruled.

In 
Burgess
, 176 Ill. 2d at 302-04, this court abandoned its view that retrospective hearings were always improper. In that case we held that a defendant who has been denied his right to a fitness hearing under section 104–21(a) of the Code of Criminal Procedure of 1963 is not automatically entitled to a new trial under 
Brandon
 and its progeny if evidence subsequently presented to the court establishes that the defendant did not, in fact, suffer any impairment as a result of his ingestion of psychotropic medication.

Shortly after 
Burgess
 was decided, this court held that the rule announced in that case was subject to an important exception. In 
People v. Neal
, 179 Ill. 2d 541 (1997), we stated that if more than a year has elapsed since the original trial and sentencing, a retrospective fitness determination is not normally adequate to protect the defendant's due process rights. Unless exceptional circumstances exist where it can still be shown that the psychotropic medication could not possibly have had any effect on the defendant's fitness, a defendant who failed to receive the hearing mandated by section 104–21(a) at the time of his original trial and sentencing is entitled to a new trial.

Resolution of the case before us today should involve nothing more than a straightforward application of these principles. Because more than a year has passed since defendant was convicted and sentenced, and because this is not a case where we can say that the medication could not possibly have had any effect on defendant's fitness, a retrospective fitness determination could not adequately protect his due process rights. That being so, the initial failure to provide defendant with the statutorily mandated fitness hearing at the time of his trial necessitates that his conviction and sentence be vacated and that the cause be remanded for a new trial.

For these reasons, and no others, I concur in the majority's judgment.

JUSTICE HEIPLE, dissenting:

Because the majority opinion seriously misconstrues both the law and the facts in this case in a variety of ways, I respectfully dissent.

At the time of this court's first opinion in this case, the statute regarding a criminal defendant's use of psychotropic medication provided as follows:

“A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication.” 725 ILCS 5/104–21(a) (West 1994).

The statute was amended effective December 31, 1996, and now provides:

“A defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications.” 725 ILCS 5/104–21(a) (West 1996).

The State contends that the amended statute applies to the instant case. Defendant responds that the statute does not apply to his case because his plea and sentencing occurred before the effective date of the amendment.

The appellate court has issued conflicting rulings on the retroactivity of the psychotropic drug statute (725 ILCS 5/104–21(a) (West 1996)). Compare 
People v. Perry
, 292 Ill. App. 3d 705 (1st Dist. 1997), and 
People v. Gibson
, 292 Ill. App. 3d 842 (5th Dist. 1997) (holding that statute applies retroactively), with 
People v. McKay
, 282 Ill. App. 3d 108 (2d Dist. 1996), 
People v. Jamerson
, 292 Ill. App. 3d 944 (3d Dist. 1997), and 
People v. Straub
, 292 Ill. App. 3d 193 (4th Dist. 1997) (holding that statute does not apply retroactively).

A reviewing court should apply the law as it exists at the time of the appeal, unless doing so would interfere with a vested right. 
First of America Trust Co. v. Armstead
, 171 Ill. 2d 282, 290 (1996). Where an amendment is procedural in nature, no vested rights are involved. 
Armstead
, 171 Ill. 2d at 290; see also 
Ogdon v. Gianakos
, 415 Ill. 591, 597 (1953) (“there is no vested right in any particular remedy or method of procedure”). A statute which prescribes the method by which a right is enforced is procedural and therefore subject to retroactive application. 
People v. Ruiz
, 107 Ill. 2d 19, 22-24 (1985); 
People v. Anderson
, 53 Ill. 2d 437, 440 (1973).

In light of these settled retroactivity principles, it is obvious that the current version of the psychotropic drug statute applies to the instant case. Section 104–21, in either its current or former version, does not create a substantive right. Rather, it merely prescribes a method for enforcing a criminal defendant's substantive right not to be tried while unfit. The former version of the statute directed trial courts to hold a fitness hearing when there was evidence that a defendant was taking psychotropic medication. The current version of the statute prohibits trial courts from presuming a defendant unfit for trial solely by virtue of the receipt of psychotropic drugs. Both versions of the statute concern only “the machinery to be used by the circuit court” in assessing a defendant's fitness to stand trial. 
Ruiz
, 107 Ill. 2d at 23. The amendment is therefore procedural and hence applies retroactively to cases pending on direct review such as this.

In 
People v. Nitz
, 173 Ill. 2d 151 (1996), this court stated that an amendment to section 104–21 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104–21 (West 1996)), the psychotropic drug statute, is procedural in nature and therefore retrospectively applicable to matters pending on the effective date of the amendment. 
Nitz
, 173 Ill. 2d at 162. In another opinion announced on the same day as 
Nitz
, however, this court held, in a footnote without explanation, that the amended psychotropic drug statute did not apply to a case pending on direct review. 
People v. Birdsall
, 172 Ill. 2d 464, 475 n.1 (1996); see also 
People v. Perry
, 292 Ill. App. 3d 705, 716-17 (1997) (noting contradiction between 
Nitz
 and 
Birdsall
).

The majority attempts to reconcile 
Nitz
 and 
Birdsall
 by noting that 
Nitz
 held that the General Assembly may not pass legislation retroactively changing the judicial construction of a statute. Slip op. at 15. The majority contends that 
Nitz
 therefore precludes application of the current statute to the instant case. Reading “the entirety of the 
Nitz
 opinion” as the majority urges (slip op. at 15), however, compels precisely the opposite conclusion. Because 
Nitz
 was a post-conviction case, applying the amended statute therein would have amounted to a legislative alteration of a final judicial decision, thereby violating the separation of powers doctrine. Conversely, 
Nitz
 dictates that cases which are instead pending on direct review are immediately subject to legislative changes in judicial procedure. The majority provides absolutely no explanation for its rejection of this well-settled legal principle other than reliance on the erroneous 
Birdsall
 precedent. The opinion in 
People v. Cortes
, 181 Ill. 2d 249 (1998), also invoked by the majority, contains no substantive holding whatsoever on the issue of retroactivity, but instead merely cites to the unsupported footnote in 
Birdsall
. 
Cortes
, 181 Ill. 2d at 275 n.2. Clearly, 
Nitz
 was right, 
Birdsall
 was wrong, and the current statute applies to cases pending on direct review.

Defendant further argues, however, that retroactive application of the psychotropic drug statute would violate section 4 of the Statute on Statutes (5 ILCS 70/4 (West 1996)), which provides, in relevant part, as follows:

“No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding.” 5 ILCS 70/4 (West 1996).

Defendant's argument that retroactive application of the statute would violate this section fails to account for a crucial provision therein. When a statute has been amended, section 4 indeed prohibits courts from construing the new law to affect any right or claim existing under a former law. Section 4 then adds, however, this significant caveat: “
save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding
.” (Emphasis added.) 5 ILCS 70/4 (West 1996). Far from refuting the rule of construction that procedural amendments are to be retroactively applied, then, section 4 instead codifies and reinforces this traditional legal principle. Accordingly, this court should apply the current version of section 104–21 of the Code of Criminal Procedure (725 ILCS 5/104–21 (West 1996)) to defendant's contentions regarding his receipt of psychotropic medication.

I also strongly disagree with the majority's creation of a new standard of review to be employed by this court following remand for further fact-finding such as in the instant case. The majority cites no authority for its new “
sui generis
” standard (slip op. at 19), and such a standard cannot be justified under established legal principles. The circuit court is required to order a fitness hearing when a
 bona fide
 doubt of the defendant's fitness is raised. 725 ILCS 5/104–11 (West 1996). Whether a 
bona fide
 doubt of the defendant's fitness has been raised is a determination within the discretion of the trial court. 
People v. Murphy
, 72 Ill. 2d 421, 431 (1978). The trial court's determination of this question therefore should not be disturbed absent an abuse of its discretion. We are not justified in departing from this well-settled standard of review simply because we have “retained jurisdiction” over a case during remand.

Application of the traditional abuse-of-discretion standard of review to the facts of the instant case compels the conclusion that defendant was not entitled to a fitness hearing. On remand, medication logs for 1992 were introduced which established that defendant received a daily dose of 100 milligrams of the psychotropic medication Thorazine from June 20 through July 17, July 20 through September 26, September 28 through October 31, and November 2 through 4. Thereafter, a dose of 50 milligrams of Thorazine was given on November 11, November 13 through 21, and November 23 through 30. All doses were given at night as a sleeping aid. Defendant entered his plea on October 21, 1992. His sentencing hearing was held on November 23 and 24, 1992.

At the hearing on remand, Curtis Eugene Pierce, Fulton County jail administrator, testified that defendant was incarcerated at the jail from March 12 to November 5, 1992. Pierce testified that defendant was occasionally irritable and disrespectful towards jail staff both before and after June 20, 1992. Pierce also testified that defendant was transferred out of the jail on November 5, 1992, because he injured another inmate with a sharpened object.

Leland F. Keith, chief deputy sheriff of Mason County, testified that defendant was transferred to the Mason County jail on November 5, 1992, where he remained for approximately one month. Keith testified that he did not notice anything unusual about defendant's behavior while he was incarcerated there.

Gayle Carper, co-counsel for defendant at the time of his plea and sentencing, testified that while defendant sometimes exhibited an inability to follow conversations and make eye contact, his behavior was not noticeably different from that of other jail inmates she had interviewed. Carper stated that during her conversations with defendant regarding his guilty plea, he appeared to be thinking logically, although he also appeared depressed.

Philipp E. Bornstein, a clinical psychiatrist, then testified that Thorazine is a nonaddictive, psychotropic medication which is commonly used in the treatment of major mental disorders such as schizophrenia and bipolar disorder. He stated that an average dose for such treatment is 400 to 600 milligrams. Dr. Bornstein further testified that Thorazine is sometimes given in smaller doses as a sleeping aid to persons who, because of prior substance abuse, are at risk of becoming addicted to traditional sleeping pills. He testified that ingestion of a 100-milligram dosage of Thorazine for this purpose would have no antipsychotic effects at all. Rather, the only noticeable effect would be diminished anxiety and increased ability to sleep. Dr. Bornstein concluded, after reviewing the medication logs and the trial court records in the instant case, that the Thorazine administered to defendant did not hinder his ability to understand the charges against him and make rational decisions about pleading and sentencing options. If anything, Dr. Bornstein suggested, the medication may have improved defendant's ability to think clearly by lessening his anxiety and allowing him to rest well.

Samuel Dedman Shillcutt, a neuropsychopharmacologist, then testified that a 100-milligram dose of Thorazine would not have a substantial effect on a person's ability to reason. Shillcutt stated that his review of the record in this case indicated that defendant was not uncooperative with counsel, did not exhibit disordered thought, and was not illogical in his reasoning. Shillcutt therefore concluded that the Thorazine administered to defendant did not affect his behavior with regard to participating in his defense.

Alesia McMillen, defendant's lead trial counsel, then testified that defendant was cooperative and responsive in preparing his defense. McMillen stated that she became upset when defendant chose to reject the plea agreement she had brokered and to seek the death penalty instead. She told defendant that she thought she should withdraw as his attorney because she could not support his decision to seek a death sentence. McMillen testified that defendant asked her not to withdraw, told her that he thought she had done a good job representing him, and tried to comfort her. She said that defendant nevertheless continually maintained that seeking the death penalty was the right decision for him. She said that while she did not agree with this decision, she nevertheless felt that defendant was competent to make it, and that the decision was not irrational.

John R. Day, a clinical psychologist, then testified that he examined defendant in a series of three visits in June, July and August of 1992. At the time of the latter two visits, defendant was taking Thorazine as a sleeping aid, although Dr. Day was not then aware of this fact. Dr. Day testified that he had worked with many patients being administered Thorazine and that a 100-milligram dose of the medication has no effect on a person's ability to make reasoned judgments. He further testified that he had never seen any negative side effects result from a 50- to 100-milligram dose of Thorazine. Dr. Day stated that during his examinations of defendant, defendant's speech was coherent and responsive. In Dr. Day's opinion, defendant was fully able to understand the nature of the charges against him and cooperate in his defense.

Michael Gelbort, a clinical psychologist trained in neuropsychology, then testified that he examined defendant on September 22, 1995, in order to evaluate defendant's psychological condition as well as his likely personality functioning and understanding at the time of his plea and sentencing hearing three years earlier. Dr. Gelbort testified that defendant showed signs of cognitive dysfunction associated with possible substance abuse and physical abuse. He further testified that while Thorazine can improve a person's thought processes by reducing anxiety, it can also impair judgment by making one less aware and adaptive. Dr. Gelbort testified that a 100-milligram dose of Thorazine was at the lower end of prescribed usage, and so would not generally be employed for antipsychotic effect. He also testified that Thorazine's major side effect, motor dysfunction, typically occurs at higher dosage levels. Nevertheless, he stated that diminished cognitive capacity could result from a 100-milligram dose of Thorazine. Finally, Dr. Gelbort stated that he believed that defendant's ability to make a reasoned decision at the time he rejected his plea offer and sought the death penalty was affected by his use of Thorazine.

The court then filed a memorandum opinion in which it found that defendant took the psychotropic medication Thorazine as a sleeping aid on the dates and in the amounts indicated in the logs. The court found that Thorazine is typically prescribed in a dosage range from 50 to 2,000 milligrams, and that defendant's use of 50 to 100 milligrams was therefore in the low end of the dosage range. The court further found that Thorazine was prescribed because defendant had trouble sleeping due to anxiety, and that defendant had very little trouble sleeping after he began taking the medication.

The court also noted that defendant had stated that he rejected the negotiated plea and instead sought the death penalty because he was young, had previously been incarcerated, and did not wish to spend the rest of his life in prison. The court found this decision to be logical, although not one a majority of persons under similar circumstances might be expected to make. The court found that at the time defendant entered his plea, he expressed both an ability to work with his legal counsel and a faith in counsel's efforts. The court also found that, at the time of his plea, defendant had recently been examined by a psychologist, and his trial counsel believed him to be fit to enter the plea. Accordingly, the court concluded that the Thorazine defendant was taking at the time of his plea and sentencing did not appear to have a medically significant effect.

The evidence adduced on remand fully comports with the trial court's conclusion that defendant's use of Thorazine as a sleeping aid was not medically significant with regard to his fitness to stand trial. Substantial medical testimony supported the court's finding that the 50- to 100-milligram doses of Thorazine administered to defendant did not create a 
bona fide
 doubt as to his fitness. All of the individuals who negotiated, counseled, and worked with defendant at the time of his plea and sentencing, including a practicing psychologist, testified that defendant actively participated in his defense and fully appreciated the consequences of his decisions. The only expert who testified that defendant was affected by the medication, Dr. Gelbort, did not examine, or even meet, defendant until more than three years after the sentencing hearing, and even he admitted that the dosage given to defendant was lower than that typically used for antipsychotic purposes. In light of this evidence, I would hold that the trial court did not err in failing to order a fitness hearing. I would therefore proceed to consider defendant's remaining arguments on appeal.

For all of these reasons, I respectfully dissent.

JUSTICES MILLER and BILANDIC join in this dissent.